# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DELENE GLANTZ, both individually and as the Administratrix of the ESTATE OF ELLIOT K. GLANTZ 725 Palmer Street Portsmouth, VA 23704 | : : : : : |
| Plaintiff | : Docket No.: |
| v. | : : |
| MONTGOMERY COUNTY One Montgomery Plaza 425 Swede Street Norristown, PA 19401 | : : : **JURY TRIAL DEMANDED** : |
| and | : : |
| MAJOR SEAN SMITH c/o MONTGOMERY COUNTY CORRECTIONAL FACILITY 60 Eagleville Road Eagleville, PA 19403 | : : : : : : |
| and | : : |
| CORRECTIONAL OFFICER TONY SHADE c/o MONTGOMERY COUNTY CORRECTIONAL FACILITY 60 Eagleville Road Eagleville, PA 19403 | : : : : : : : |
| and | : : |
| CORRECTIONAL OFFICER RILEY SINNER c/o MONTGOMERY COUNTY CORRECTIONAL FACILITY 60 Eagleville Road Eagleville, PA 19403 | : : : : : : |
| and | : : |

CORRECTIONAL OFFICER JOSEPH                    :
BELLISSIMO                                     :
c/o MONTGOMERY COUNTY                          :
CORRECTIONAL FACILITY                          :
60 Eagleville Road                             :
Eagleville, PA 19403                           :
                                               :
     and              :
                                               :
CORRECTIONAL OFFICER                           :
J. SUBRAMANI                                   :
c/o MONTGOMERY COUNTY                          :
CORRECTIONAL FACILITY                          :
60 Eagleville Road                             :
Eagleville, PA 19403                           :
                                               :
     and              :
                                               :
CORRECTIONAL OFFICERS                          :
JOHN/JANE DOES (1-10) (fictitious)             :
c/o MONTGOMERY COUNTY                          :
CORRECTIONAL FACILITY                          :
60 Eagleville Road                             :
Eagleville, PA 19403                           :
                                               :
    and                    :
                                               :
PRIMECARE MEDICAL, INC.                        :
3940 Locust Lane                               :
Harrisburg, PA 17109                           :
                                               :
    and                    :
                                               :
MARISA FRIEDMAN, Psy.D.                        :
c/o PRIMECARE MEDICAL, INC.                    :
3940 Locust Lane                               :
Harrisburg, PA 17109                           :
                                               :
    and                    :
                                               :
EMILY SCORDELLIS, Psy.D.                       :
c/o PRIMECARE MEDICAL, INC,                    :
3940 Locust Lane                               :
Harrisburg, PA 17109                           :
                                               :

2

|  | : |
| --- | --- |
| and | : |
|  | : |
| MEDICAL PROVIDERS | : |
| JOHN/JANE DOES (1-10) (fictitious) | : |
| c/o PRIMECARE MEDICAL, INC. | : |
| 3940 Locust Lane | : |
| Harrisburg, PA 17109 | : |

                                        Defendants

## COMPLAINT

## THE PARTIES

1.        Plaintiff, Delene Glantz, is an adult individual residing at 725 Palmer Street, Portsmouth, VA  23704.

2.        On August 15, 2022, Plaintiff was granted Letters of Administration by the Register of Wills Office of Bucks County, Pennsylvania to act as the Administratrix of the Estate of Elliot K. Glantz, her deceased son ("Glantz").

3.        Glantz was born on July 14, 1990 and hung himself to death on September 29, 2020 while an inmate at Montgomery County Correctional Facility ("MCCF"), a county prison located on 60 Eagleville Road in Eagleville, Pennsylvania.  Having just turned 30 years old, he was survived by Plaintiff (his mother residing at the above-captioned address) and his father Mark Gardner (residing at 1275 Baker Road, Lot 129B, Virginia Beach, VA  23455).

4.        Defendant Montgomery County ("the County") is a municipality within the Commonwealth of Pennsylvania, located at One Montgomery Plaza, 425 Swede Street, Norristown, PA 19401.  At all relevant times, the County owned and operated MCCF and employed the Officer Defendants identified below.

5.      Defendant Major Sean Smith ("Maj. Smith") was, at all relevant times, a Major at MCCF, acting under the color of law and within the course and scope of his employment with the County.

6.      Defendant Correctional Officer Tony Shade ("CO Shade") was, at all relevant times, a Correctional Officer at MCCF, acting under the color of law and within the course and scope of his employment with the County.

7.      Defendant Correctional Officer Riley Sinner ("CO Sinner") was, at all relevant times, a Correctional Officer at MCCF, acting under the color of law and within the course and scope of his employment with the County.

8.      Defendant Correctional Officer Joseph Bellissimo ("CO Bellissimo") was, at all relevant times, a Correctional Officer at MCCF, acting under the color of law and within the course and scope of his employment with the County.

9.      Defendant Correctional Officer J. Subramani ("CO Subramani") was, at all relevant times, a Correctional Officer at MCCF, acting under the color of law and within the course and scope of his employment with the County.

10.     Defendant Correctional Officers John/Jane Does (1-10) were correctional officers or supervisors employed by the County to work at MCCF.  Plaintiff does not presently know the names of these defendants after conducting a reasonable search, including a review of pre-complaint discovery produced by the County.  Plaintiff expects to learn the names of these additional correctional officers and/or supervisors through formal discovery and will promptly take steps to substitute actual names for these fictious names.[1]

---

[1] The County, Maj. Sean Smith, CO Shade, CO Sinner, CO Bellissimo, CO Subramani, and Correctional Officers John/Jane Does (1-10) are hereinafter collectively referred to as the "Officer Defendants".

11.     Defendant PrimeCare Medical, Inc. ("PrimeCare") is an active Pennsylvania corporation with a principal place of business at the above-captioned address which, at all relevant times, was under contract with the County to provide medical care, including psychiatric and mental health services, to MCCF prisoners such as Glantz.  Upon information and belief, at all relevant times, PrimeCare employed the Medical Defendants identified below.

12.     Defendant Marisa Friedman, Psy.D. (Dr. Friedman") was, at all relevant times, a Psychologist who was working at MCCF and responsible for coordinating and implementing its mental health program, acting under the color of law and within the course and scope of her employment and/or agency with PrimeCare.

13.     Defendant Emily Scordellis, Psy.D. ("Dr. Scordellis") was, at all relevant times, a Psychologist who was working at MCCF as PrimeCare's Director of Behavioral Health, acting under the color of law and within the course and scope of her employment and/or agency with PrimeCare.

14.     Defendant Medical Providers John/Jane Does (1-10) were doctors, nurses, or other medical providers working at MCCF as employees and/or agents of PrimeCare.  Plaintiff does not presently know the names of these defendants after conducting a reasonable search, including a review of discovery produced by PrimeCare.  Plaintiff expects to learn the names of these additional medical providers through formal discovery and will promptly take steps to substitute actual names for these fictious names.[2]

---

[2] PrimeCare, Dr. Friedman, Dr. Scordellis, and Medical Providers John/Jane Does (1-10) are hereinafter collectively referred to as the "Medical Defendants".  Plaintiff is asserting, *inter alia*, a professional negligence claims against the Medical Defendants and is filing herewith the appropriate Certificates of Merit in accordance with Pennsylvania Rule of Civil Procedure 1042.3 (collectively attaching the Certificates as Exhibit A hereto).

15.     At all relevant times, the County and PrimeCare were acting, or alternatively failed to act, by and through their employees, agents, and/or ostensible agents, who were acting within the course and scope of their employment, agency, and/or ostensible agency.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction of this action over all Defendants pursuant to 42 U.S.C. § 1983 as well as 28 U.S.C. § 1331.  This Court has jurisdiction over the pendant state tort law claims pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to Plaintiff's claims took place here, as did Glantz's suicide.

## FACTUAL BACKGROUND

18.     Long before he hung himself on September 29, 2020, Glantz's mental health issues and troubled history were well known to both the County and PrimeCare.

19.     According to PrimeCare records, during a November 21, 2017 intake screening at Bucks County Correctional Facility ("BCCF"), PrimeCare noted that Glantz treated with a psychiatrist ten years prior.

20.     During a subsequent detainment at BCCF, on February 28, 2018, PrimeCare noted that Glantz had a history of bipolar, ADHD, and depression and required mental health treatment, for which Glantz was placed under Psychiatric Observation.

21.     During a mental health treatment on March 13, 2018, PrimeCare noted: "Bipolar and ADHD DO: IM has an extensive history of MH treatment and medications. Currently denied any symptoms. IM appeared to be minimizing his disorder and symptoms. Penn Foundation FACT Team in the past, about two years ago."

22.     With respect to suicidal ideation, PrimeCare noted: "History of Suicide Attempts (Denied any current SI, HI or Hallucinations IM denied any history of suicide attempts or self injurious behaviors until this writer provided IM with known information. IM then described his past attempts. IM appeared disingenuous about his MH history.)

23.     During a suicide risk assessment one week later, on March 20, 2018, PrimeCare noted suicide risk factors including major depression and prior suicide attempts.

24.     During a subsequent detainment at BCCF, on August 25, 2018, PrimeCare again noted that Glantz had a history of bipolar, ADHD, and depression and required mental health treatment.  On an intake suicide screening that same date, PrimeCare noted that Glantz's family or significant other has attempted or committed suicide.

25.     On September 7, 2018, PrimeCare completed a referral form for community treatment at Penn Foundation, Inc., stating, *inter alia*, that Glantz: (a) needed mental health treatment; (b) had Bipolar, ADHD, and Depression; (c) previously medicated with Paxil and Seroquel; (d) had past suicidal ideations including "thinking about crashing his car into a wall in 2010"; (e) was involuntarily committed to the Horsham Clinic for 30 days in 2010; (f) received mental health treatment at Penn Foundation in 2013 or 2014; and (g) received drug and alcohol rehabilitation at Penn Foundation in 2018 before leaving against medical advice after 11 days.

26.     On another referral form dated October 2, 2018, PrimeCare noted Glantz's mental health history, including another suicide plan to crash his car in 2013.

27.     On September 21, 2019, during another intake screening at BCCF, PrimeCare noted Glantz's mental health problems during prior incarcerations, along with his diagnoses of Bipolar, ADHD, Depression, and Anxiety.  At that time, Glantz apparently denied prior suicide attempts, but acknowledged the need for continued mental health treatment.

28.     During a mental health intake on September 24, 2019, PrimeCare noted "Pt reported a hx of bipolar disorder, ADHD, and depression. He endorsed symptoms to include mood swings, racing thoughts, and restlessness."  It was further noted that Glantz had so many incarcerations at BCCF between 2009 and 2019 that he "lost count".

29.     On another Bucks County Residential Referral Form dated October 23, 2019, PrimeCare noted that Glantz was positive for self-harm 2 years ago and had a history of suicidal ideation "two plus years ago and ongoing."

30.     PrimeCare records noted additional mental health concerns and treatment at BCCF during the end of 2019 and beginning of 2020, during which he was administered Remeron for depression and anxiety.

31.     Glantz arrived at MCCF on September 5, 2020, detained for a parole violation.

32.     Upon intake, Glantz purportedly admitted to alcohol dependency, but denied any other medical history including mental health, as well as any prior suicide attempts or ideations.

33.     Despite noting Glantz's 2019 commitment to BCCF (during which a significant mental health history was known to PrimeCare, as stated above), Glantz's erroneous denials were blindly accepted and no medical referrals were made.  Glantz signed PrimeCare's authorization form, authorizing PrimeCare to obtain his medical records from all other health care providers, without limitation.

34.     That same day, Physician Assistant Christopher Diaz ("PA Diaz") ordered Librium for alcohol detoxification, and Glantz underwent daily checks over the course of the next five days.

35.     Glantz was non-compliant with his detoxification medications and was assessed by PA Diaz in response to a sick call request on September 10, 2020, at which time Glantz

purportedly continued to deny any mental health issues but admitted to marijuana and tobacco dependencies.

36.     On September 11, 2020, a mental health appointment was created for "mood swings and sleep".  PrimeCare noted: "prior to coming in, pt was scheduled to see psychiatrist, mood swings and sleep."  No medications were ordered.

37.     Five days inexplicably passed before Glantz was seen by Dr. Friedman.  In the interim, during a detoxification check on September 14, 2020, mild anxiety was noted.

38.     On September 16, 2020, Glantz was finally evaluated by Dr. Friedman, who learned that Glantz: (a) had been incarcerated over 23 previous times; (b) had received outpatient mental health care at Penn Foundation; (c) was 302'd at Horsham Clinic in 2010; (d) took Seroquel and another psychotropic medication a few years earlier but did not keep up with it because he was "in and out of jail"; (e) had a history of drug and alcohol use, for which he was treated inpatient at Penn Foundation; and (f) had last used drugs or alcohol "within the week" (even though he was detained at MCCF for 11 days).

39.     According to Dr. Friedman, Glantz stated he had been diagnosed with bipolar disorder and ADD, but did not report same at intake because he was "intoxicated on methamphetamine" and "just answered no to all the questions."  Further, while Glantz denied suicidal ideation and a history of suicide attempts, he complained of mood swings and racing thoughts, stating "I think about a lot of stuff and it makes my mood go up and down."

40.     Dr. Friedman assessed an unspecified mood disorder and referred Glantz to psychiatry, with mental health follow-up "as needed".  Dr. Friedman placed a task for Glantz to be seen by psychiatry on September 28, 2020, after his detox process was complete, and

scheduled a mental health appointment for October 1, 2020 to "assess rater after seen by psychiatry." She did not order any medications.

41.     On September 21, 2020, Dr. Scordellis approved and cosigned Dr. Friedman's appointment notes from 5 days prior.

42.     That same day, Glantz was apparently moved from intake housing quarantine (Cell Q3, section 09 bed) to housing section C2 cell 86. He was also seen by a nurse for collection of a COVID nasal swab, the last documented clinician encounter prior to Glantz's hanging a week later.

43.     PrimeCare and/or MCCF inexplicably canceled Glantz's psychiatry appointment scheduled for September 28th, and Glantz never treated with psychiatry as planned and as needed.

44.      On the morning of September 28th, Glantz called his mother and, as with previous calls with both her and his father during his September detainment at MCCF, they said "I love you" to each other.

45.     That afternoon, Glantz called his friend Kate Feathers and can be heard crying to her that he was "so scared", "having nightmares", and would rather be "in the cold" than at MCCF. This particular call was deemed noteworthy by MCCF, as it was the only phone call among many which Major Smith logged into evidence post-incident.

## THE SUICIDE

46.     According to Officer Log Reports, in the early morning of September 29, 2020, including at 5:53 am, C/O Subramani completed multiple tours of C-Pod sections 1, 2, 3 and found "[n]o issues to report." In C/O Subramani's Incident Report, he stated that, at

approximately 5:53 am, "While conducting a routine tour in C-2, I visually observed inmate Glantz, Elliot in his bed and he appeared to be asleep and in no form of distress."

47.     According to the same Officer Log Reports, C/O Shade (the C pod housing unit control officer) toured C pod at 6:03 am and found "all inmates secure." At 6:32 am, C/O Sinner supposedly "hand[ed] out one meal tray to each individual in C pod."

48.     Although there is no reference whatsoever to Glantz in the Officer Log Report for September 28th and 29th, according to other post-incident reports, at approximately 6:41 am, inmates Robert Nardone and Richard Stoltz (occupants of C2 cell 84) alerted C/O Shade to an emergency in C2 cell 86 (after observing Glantz "in the seated position in the left corner with his eyes open, a swollen face, and a lack of body movement."

49.     In C/O Shade's Incident Report, he stated, in relevant part: "At about 6:35am I started to click C2 86 cell because inmate, Glantz Elliott, had not gotten up for breakfast trays. After going over to the cell and turning on the lights, unknown inmates had told me Glantz was dead."[3]

50.     C/O Bellissimo and C/O Sinner responded and observed Glantz hanging from a bedsheet affixed around his neck and attached to the top of the bed frame in his single-person cell.

51.     After C/O Sinner retrieved a cutdown tool from the C pod control booth, they unhanged Glantz and placed him on the floor with blood coming out his nose and mouth. Major Smith then arrived and began CPR, before giving way to prison medical staff and then township paramedics.

---

[3] During pre-Complaint discovery, Plaintiff's undersigned counsel requested that the County produce, *inter alia*, all video recordings of Glantz and his cell on the day of the hanging. Despite producing incident reports and other documentation, the County refused heretofore to produce video recordings, which presumably will either corroborate or contradict C/O Shade's account.

52.     According to the EMS report, when paramedics arrived, they noted dependent lividity and no CPR being performed, with guards stating they stopped CPR because "[Glantz] appeared to be down to long for CPR to help."

53.     Glantz was pronounced dead at the scene at 6:58 am, cause of death by hanging.

54.     According to the coroner report authored by Forensic Pathologist Ian C. Hood, when prison staff responded, Glantz "was already exhibiting obvious lividity and the early onset of rigor mortis", signifying, upon information and belief, that Glantz had already been dead for at least 1-2 hours.

55.     According to an Incident Report, when a MCCF staffer called Plaintiff a few hours after Glantz was pronounced dead, "she was struck with grief and could not speak", having to call back ten minutes later, followed by a call from Glantz's concerned father.

## PREVALENCE OF INMATE SUICIDES AND ATTEMPTED SUICIDES

56.     Unfortunately, Glantz's suicide was far from an isolated incident.

57.     According to published statistics, there were 25 MCCF inmate deaths, including 6 suicides by hanging, in the decade from 2007 through 2016.  There were 2 more suicides by hanging in 2017; 1 more in 2018 (on the same day as another death); and at least 1 more in 2019. Additionally, reports of attempted suicides increased exponentially (from 8 to 45) between 2012 and 2017.

58.     In early 2017, then MCCF Warden Julio Algarin touted MCCF's purported ability to "screen for mental health problems" under a suicide watch program, stating "I am very proud to note that we prevented 38 suicides in 2016."  He also proclaimed that the County invested an additional $2 million in psychiatric services and medical professional staffing (from an annual budget believed to exceed $400 million), increasing hours by around 43 percent.

59.     In February of 2019, WHYY.org published an article titled "*81 Pa. county jail suicides in 4 years: A look at how jails report deaths*".  In addition to the 81 reported suicides between 2015 and 2018 in Pennsylvania county jails, (including those referenced above at MCCF), there were a staggering 715 suicide attempts during the same 4 year period.  The article cited to a 2015 report from The Marshall Project titled "*Why Jails Have More Suicides than Prisons*", proffering that those confined in jails have a higher rate of mental illness and that a jail's intake protocols are not under the same microscope as in state prisons.

60.     With respect to the County in particular, the aforementioned article stated: "Over several years, Montgomery County in suburban Philadelphia has ranked high for the number of attempted suicides reported — both in raw numbers and when you adjust for the number of inmates at facilities.  But John Corcoran, a spokesperson for the county, said the county ranks high because staff at the jail 'take suicide prevention so seriously.' Staff will send inmates to the medical division and place them on suicide watch if there's any indication of suicidal thoughts, he said."

61.     Reportedly, in April of 2018, following 3 inmate suicides in a 6 month period and with more than half of its infirmary beds occupied by inmates on suicide precautions, MCCF implemented a suicide awareness and prevention training session for its correctional officers.  In an effort to educate corrections staff, MCCF reportedly implemented a protocol called "QPR" – standing for Question, Persuade, and Refer – under which corrections officers learning of an inmate's personal loss or setback should immediately file a report with prison medical staff and inform officers on the next shift about any suspicious behavior.

62.     In a 2021 article called "*Mental Health Services in Jails and Prisons*" from a Cabrini University organization called Rethink Criminal Justice, MCCF Assistant Warden

Marcy D'Orazio is quoted as saying "Criminal justice is a helping career…We are primarily here to make sure people are treated fairly and provide the treatment and services they need….Jail is not the place for people with mental health.  Jails are turning into mental health hospitals.  We are facing a huge crisis with that."  The same article noted MCCF's "established partnership with PrimeCare, a medical provider, that works with mental health inmates to provide services and treatment."

63.     According to the minutes from a recent meeting of the MCCF Board of Prison Inspectors (during which Warden McGee distributed several articles regarding the prevalence of mental illness generally and specifically in Pennsylvania prisons), from 2017 to 2021, there was a 90% increase in "serious mental illness" inmates, with a 58% decrease in the inmate population, and from January 2021 through May 2022, there were 149 suicide attempts.

## PATTERN AND PRACTICE OF CONSTITUTIONALLY DEPRIVING PRISONERS WITH SERIOUS MENTAL ILLNESS

64.     Long before the County and PrimeCare allowed Glantz to end his life in their custody, they were well aware of their failures to appropriately treat numerous prisoners like Glantz suffering from mental illness and substance abuse.

65.     For example, on December 22, 2014, Pamela Minnich filed a Section 1983 lawsuit against the County and PrimeCare [Case:2:14-cv-07236], in relation to her husband David's 2012 suicide by hanging as a pretrial detainee at MCCF.  According to the Complaint, as with Glantz, Minnich demonstrated severe anxiety but inexplicably never saw a psychiatrist during his detainment.

66.     In addition to alleging deliberate indifference and medical negligence with respect to David Minnich in particular, his widow alleged, *inter alia*: "*The Plaintiff believes and*

*therefore avers that the Defendants, Montgomery County and/or PMC/CMC have adopted and maintained for many years a recognized and accepted policy consisting of an inadequate system of review of claims of inadequate medical care, which system has failed to identify instances of deliberate indifference to serious medical needs or insure that prisoners serious medical needs are being met."*

67.     In February of 2016, the lawsuit was dismissed after resolving for an undisclosed amount.

68.     Indeed, the Minnich lawsuit was one of many such lawsuits filed over the years against the County, PrimeCare, and its agents/employees stemming from their deliberate indifference to serious medical needs.

69.     On October 22, 2019, the Estate of Terrence Taylor filed a Section 1983 lawsuit against the County and PrimeCare [Case:2:19-cv-04921], stemming from his non-suicidal death following a severe medical episode while being detained at MCCF.  In addition to alleging deliberate indifference and medical negligence, the Complaint brought a *Monell* claim alleging improper training, policies, and supervision.  The Estate settled constitutional claims against the County defendants for $1.5 million in April 2021 and is currently proceeding with its claims against PrimeCare and other medical defendants.

70.     Similarly, on January 22, 2020, the Estate of Eric Viney brought a Section 1983 lawsuit against the County and PrimeCare [Case:2:20-cv-00367], stemming from his non-suicidal death following a severe medical episode while being detained at MCCF.  The Complaint, filed 8 months **before** Glantz's suicide, listed a number of other civil rights lawsuits brought against the County and/or PrimeCare alleging deliberate indifference to serious medical

needs.  Upon information and belief, following a December 2020 settlement conference, the lawsuit resolved.

71.     In addition to these publicly filed lawsuits, Defendants' unconstitutional patterns and practices have been the subject of numerous news articles.

72.     For example, in an April 8, 2015 article from MintPress News titled *Did Prison Contractor PrimeCare Cause Pennsylvania Inmate Deaths?*, two particular lawsuits involving Lehigh County deaths were discussed.  Notably, the article stated: "The stories outlined in these complaints line up perfectly with those coming out of other jails that have outsourced their medical care to companies like PrimeCare and other private inmate medical contractors, across the country. In almost every case, an individual's most basic health needs are unarguably unmet as their condition visibly deteriorates. Many times the complaints involve shocking stories of negligent or malicious behavior on behalf of medical staff who probably should have never been working there in the first place. It is at that point only — the point of no return for far too many inmates — that the private medical company finally springs into action, sending the inmate off to emergency rooms where many die or go on to suffer from lifelong injury."

73.     A December 13, 2021 article published by *Pennlive.com*, focusing on PrimeCare, stated that it was a named defendant in 18 federal lawsuits filed in Pennsylvania in 2021 alone. The article quoted Alexandra Morgan-Kurtz, managing attorney for the nonprofit Pennsylvania Institutional Law Project, as labeling healthcare in county jails "pretty abysmal".  According to Morgan-Kurtz, for-profit companies like PrimeCare under flat fee contracts with the counties have "significant financial incentives to not provide robust medical care" – the more services provided the less profits made.  The article also cited a 2020 analysis by Reuters, finding that

county jails relying on private medical providers like PrimeCare had a higher death rate than those that used public providers.

74.     In a recent May 1, 2022 Prison Legal News article titled *PrimeCare: Less Medical Care for Prisoners, Higher Expenses for Taxpayers, More Profits for Corporate Owner*, a litany of wrongful death and suicide related lawsuits were discussed.  According to the article, 26 lawsuits were filed against PrimeCare since 2009 stemming from inadequate prison medical care, 9 of which were suicide related and 6 of which settled between November 2017 and November 2019 for nearly $14 million (with 5 other cases settling for undisclosed amounts). The author concluded: "For companies like PrimeCare, their fundamental business model is to get as much money from the government and then provide as little medical care as possible."  In particular, the article referenced the following notable lawsuits:

- *Reilly v. York City*, (M.D. Pa. Case 18-01803) – 2016 hanging settled in 2021

- *Beers v. Cnty. of Northumberland* (M.D. Pa. Case 14-02349 – 2013 hanging settled 2016

- *Lewis v. Cnty. of Northumberland* (M.D. Pa. Case 14-02126) – 2014 suicide settled 2019

- *Ponzini v. Monroe Cty.*, 789 Fed. Appx. 313 (3d Cir. Nov. 2019) – 2009 suicide led to an $11.9 million verdict against PrimeCare and others in 2016, including an $8 million punitive damages award reinstated by the Third Circuit approximately 6 months before the Glantz suicide

- *Flyte v. Cty. of Northampton* (E.D. Pa. Case 19-00703) - 2017 hanging settled 2019

- *Applegate v. Cty. of Northampton* (E.D. Pa. Case 17-03885) - 2015 suicide settled 2019

- *Schnee v. Berks Cty.* (E.D. Pa. Case 14-03195) – 2013 suicide settled 2016

- *Freitag v. Bucks Cty.* (E.D. Pa. Case 19-05750) – 2018 suicide case pending

- *Stewart v. Emmons* (E.D. Pa. Case 12-01509) – 2010 suicide attempt settled 2014

- *James v. Monroe Cty.* (W.D. N.Y. Case 20-07094) – 2018 hanging case pending

75.     The widespread prison suicide problem, far beyond just MCCF, has been well publicized for years now.  In a February 20, 2020 Philadelphia Inquirer article titled *Pennsylvania prison suicides are at an all-time high.  Families blame 'reprehensible' medical-health care*, Christine Tartaro, a professor of criminal justice at Stockton University, is quoted as saying: "Suicide is very preventable in prison and jail systems…Increases in institutional suicides are often tied to insufficient psychiatric screening and inadequate mental-health staffing levels".

76.     Despite numerous and repeated inmate suicides and suicide attempts over the years, the County and PrimeCare failed to create, implement and/or enforce the necessary policies and customs to protect civil rights of MCCF prisoners, thereby establishing a custom of violating civil rights of those within their custody and control.

77.     The County failed to adhere to the **Mental Health Goal** stated on its website: *Our unified goal is to ensure that all mental health clients who meet the criteria for the Office of Mental Health and Substance Abuse Services target population and are at Montgomery County Correctional Facility will have their treatment and community support needs met.  The goal is that through this collaborative process all of the target population mental health clients will leave the prison with a community support plan. Additionally, we hope this process will assist the Montgomery County Correctional Facility staff in their efforts to provide care for their mental health clients.*  As for its so-called collaborative process for mental/behavioral health services, the County's website states: *The correctional facility has established a partnership with Prime Care and the Montgomery County*

*Behavioral Health / Developmental Disabilities Department to accomplish a team approach*

*for planning and working with mental health clients who are identified and incarcerated in*

*the Montgomery County Correctional Facility.*

78.     And PrimeCare failed to adhere to its Vision Statement: "*PrimeCare Medical,*

*Inc. is committed to managing and reducing risk in correctional healthcare by providing*

*cost-effective quality healthcare management, continuously improving the standards of care,*

*and striving for national accreditation for all facilities. Dedicated to correctional*

*healthcare, PrimeCare Medical prides itself on our strong client relationships, effective and*

*efficient management of healthcare services. These attributes continue to be the hallmark of*

*our success.*"

79.     Egregious and rampant failures on the part of the Officer Defendants and the

Medical Defendants led to Glantz's tragic and preventable suicide.

80.     Plaintiff now seeks recovery from all Defendants for the catastrophic and fatal

injuries, damages, and economic losses suffered by Glantz and his parents, as more fully

described below.

## COUNT I - VIOLATION OF CIVIL RIGHTS (14TH AMENDMENT) PLAINTIFF v. DEFENDANTS

81.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

82.     At all relevant times, Defendants, acting under color of law, were deliberately

indifferent to Glantz's serious medical needs in violation of the Fourteenth Amendment's ban on

cruel and unusual punishment.

83.     In particular, Defendants were deliberately and recklessly indifferent to Glantz's

vulnerability to suicide, which they each knew or should have known about on or before

September 29, 2020.

84.     For weeks (MCCF) and for years (PrimeCare), Defendants possessed actual knowledge of Glantz's serious mental illnesses, past suicidal ideations, history of failed suicide attempts, and repeated and ongoing drug and alcohol addictions and withdrawals -- all of which amounted to telltale suicide risks.

85.     Despite such knowledge, Defendants ignored, if not exacerbated, Glantz's obvious suicidal propensities and failed to take necessary and available precautions which would have saved his life, such as housing him in the appropriate observation unit; providing the appropriate diagnoses and treatments, including medications, counseling, and trained medical and mental health professionals including a Psychiatrist; obtaining and reviewing medical records from prior mental health treatments, including but not limited to those of PrimeCare; ensuring that he was observed at all times or at least at regular intervals; accurately documenting such observations; properly assessing his suicide risk; denying him a means to commit suicide (i.e. placing him alone in a cell with a bedsheet and an elevated bedframe); and rendering aid immediately and emergently once Glantz started hanging.

86.     At a minimum, Defendants were duty bound to follow well established suicide prevention standards and guidelines, the collective purpose of which was to protect and enhance the mental health of inmates such as Glantz.

87.     The 2014 Standards for Health Services in Jails and 2015 Standards for Mental Health Services for Correctional Facilities, promulgated by the National Commission on Correctional Health Care, contain a **SUICIDE PREVENTION PROGRAM** (Section J-G-05 and Section MH-G-04, respectively).  The Program established, *inter alia*:

- *Nonacutely suicidal* inmates should be placed on suicide precautions and observed at staggered intervals not to exceed every 15 minutes (e.g. 5, 10, 7 minutes), with unpredictable, documented supervision maintained;

- Patients are reassessed regularly to identify any change in condition indicating a need for a change in supervision level or required transfer or commitment.  The evaluation includes procedures for periodic follow-up assessment after the individual's discharge from suicide precautions;

- Treatment strategies and services to address the underlying reasons (e.g. depression) for the inmate's suicidal ideation are to be considered, including treatment when the inmate is at heightened risk as well as follow-up interventions and monitoring to reduce the likelihood of relapse;

- Procedures for communication between mental health care, health care, and correctional personnel regarding inmate status are in place to provide clear and current information; and

- Housing.  Unless constant supervision is maintained, a suicidal inmate is not isolated but is housed in the general population, mental health unit, or medical infirmary, and located in close proximity to staff.  All cells or rooms housing suicidal inmates are as suicide-resistant as possible (e.g., without protrusions of any kind that would enable hanging).

88.    In addition, the 2015 Standard contained Section MH-E-09 **CONTINUITY AND COORDINATION OF MENTAL HEALTH CARE DURING INCARCERATION**, mandating that all aspects of an inmate's mental health care are coordinated and monitored throughout the inmate's incarceration, in accordance with written policy and defined procedures. In relevant part, the Standard stated:

> When an inmate returns from a psychiatric hospitalization, urgent care, or emergency department visit that pertains to mental health, a mental health professional sees the patient, reviews the discharge orders, and issues follow-up orders as clinically indicated.
> …
> When delays or long wait times for specialty appointments occur, mental health staff should take intermediate care measures (e.g. placement in an observation cell) to monitor the inmate's mental status while waiting for these appointments.

89.    Defendants' failure to treat, monitor, and address Glantz's legitimate and serious medical needs transcended contemporary standards of decency, are shocking to the conscience of

mankind, and violated his Fourteenth Amendment right to be free from cruel and unusual punishment.

90.    Defendants' unreasonable, egregious, malicious, willful, and intentional acts and omissions constitute a deliberate indifference and callous disregard for Glantz's life, safety, and well-being.

91.    As a direct and proximate result of Defendants' unlawful and unconstitutional behavior, Glantz suffered serious bodily harm and death, and Glantz and his parents suffered other catastrophic damages as set forth below.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## COUNT II - VIOLATION OF CIVIL RIGHTS (*MONELL* CLAIMS) PLAINTIFF v. THE COUNTY AND PRIMECARE

92.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

93.    The violations of Glantz's constitutional rights as set forth above were directly and proximately caused by the deliberate indifference of the County and PrimeCare to the need for hiring, training, supervision, investigation, monitoring, and/or discipline with respect to the provision of specialized medical care to inmates such as Glantz, under their custody and control.

94.    The violations of Glantz's constitutional rights as set forth above were directly and proximately caused by the encouragement, tolerance, ratification of, and deliberate indifference of the County and its private mental health provider to the policies and practices of

their agents and employees of refusing, delaying, interfering with, or negligently providing timely and appropriate medical care and treatment to those in special need like Glantz.[4]

95.     The violations of Glantz's constitutional rights as set forth above were directly and proximately caused by the abject failure of the County and its private mental health provider, with deliberate indifference, to develop, implement, update, and/or enforce policies and practices to ensure that inmates like Glantz received timely, necessary, and appropriate medical care for serious mental illness and critical life saving measures.

96.     On and well before September 29, 2020, the County and its private mental health provider knew or certainly should have known of the need to improve and correct failed hiring, training, supervision, investigation, monitoring, discipline, policies, and practices by virtue of, *inter alia*, a laundry list of other suicides and suicide attempts, published statistics and news articles regarding such suicides, and other similar lawsuits, alleged above.

97.     The above referenced failures proximately caused Glantz's serious bodily injuries and death in that they directly and in natural and continuous sequence produced, contributed substantially, or enhanced such injuries and death.

98.     The aforementioned acts and/or omissions constitute willful and wanton misconduct in disregard of the rights, health, well-being, and safety of Glantz, to his detriment and that of his parents.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in

---

[4] Consistent with the longstanding pattern and practice, upon information and belief, none of the Officer Defendants or Medical Defendants were disciplined as it pertains to Glantz.  Moreover, no one was apparently even questioned as to how and why it took so long to find Glantz hanging, considering the morbid condition of his body after being discovered by other inmates.

an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

<u>COUNT III – MEDICAL NEGLIGENCE (STATE LAW)</u><br><u>PLAINTIFF v. MEDICAL DEFENDANTS</u>

99.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

100.    At all relevant times, the Medical Defendants were, upon information and belief, licensed to practice medicine in the Commonwealth of Pennsylvania, and had a duty to comply with generally accepted medical and mental health standards of care in their medical treatment of Glantz.

101.    The Medical Defendants violated their duty of care to Glantz and were careless, negligent, and reckless in the following respects:

  a.    Failure to timely and accurately recognize, diagnose, and treat Glantz's medical condition, including serious mental illness;

  b.    Failure to timely and accurately diagnose Glantz's behavior as suicidal and not just self-serving;

  c.    Failure to perform a structured suicide risk assessment and reassessment on a timely and accurate basis;

  d.    Failure to implement and maintain an intense and appropriate treatment plan to minimize the risk of suicide;

  e.    Failure to render proper and timely treatment and care to Glantz, including on an emergency/stat basis as required under the circumstances;

  f.    Failure to obtain timely and appropriate consultation from specialists, including psychiatrists and psychologists;

  g.    Failure to ensure that Glantz's psychiatry appointment, scheduled for September 28th, was not canceled irrespective of the status of his detoxification;

  h.    Failure to timely and appropriately prescribe and administer necessary medications;

  i.    Failure to provide appropriate and effective detox treatment to address Glantz's drug and alcohol withdrawal;

j.      Failure to provide necessary medical information to Glantz about the care he required and providing incomplete and incorrect information to him regarding his care;

k.      Failure to provide necessary, complete, and correct medical information to other medical professionals caring for Glantz about the care he required and/or was provided;

l.      Failure to timely appreciate the grave danger he was in and take seriously his multiple prior attempted suicides and suicide threats;

m.      Failure to timely appreciate Glantz's changes in mental status, mood swings, racing thoughts, and restlessness;

n.      Failure to house Glantz in the appropriate housing unit and for the appropriate amount of time;

o.      Failure to ensure that Glantz was placed on Suicide Watch and/or Psychiatric Observation and properly observed at documented, regular intervals, per standards, guidelines, and orders;

p.      Failure to ensure that Glantz was not provided with the means to hang himself – a bedsheet and elevated bedframe readily accessible while in his cell alone;

q.      Failure to prevent Glantz from firmly attaching his bedsheet to the top of the bedframe, and creating a noose;

r.      Failure to timely and appropriately respond by immediately initiating a Code Blue when Glantz was hanging in his cell;

s.      Failure to ensure that Glantz possessed an anti-suicide smock and blanket at all relevant times;

t.      Failure to ensure that others, including supervisors, were timely and appropriately notified when Glantz had access to the means of suicide;

u.      Failure to timely obtain and review Glantz's prior mental health treatment records, including from PrimeCare, Penn Foundation, and Horsham Clinic;

v.      Failure to heed and appropriately respond to Glantz's cries for help, as can be heard on recorded phone calls to his parents and friend (referenced above);

w.      Failure to follow appropriate suicide related training and policies; and

x.      Entrusting Glantz's care to individual(s) who it should have known would perform his/her/their duties in a negligent and/or reckless manner.

102.    The Medical Defendants' violation of their duty of care, in reckless and wanton disregard for Glantz's safety and well-being, increased the risk of harm to Glantz and was a direct and proximate cause and substantial factor in bringing about Glantz's serious bodily injuries and death.

103.    To the extent that the individual Medical Defendants were acting as employees, agents and/or ostensible agents of PrimeCare, acting within the scope and course of their employment, agency, and/or ostensible agency, PrimeCare is vicariously liable to Plaintiff.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## FIRST CAUSE OF ACTION - WRONGFUL DEATH
## PLAINTIFF V. DEFENDANTS

104.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

105.    Plaintiff is the legal representative of the Estate of Elliot K. Glantz.

106.    Plaintiff brings this action by virtue of 42 Pa. C.S.A. §8301 and Pennsylvania Rule of Civil Procedure 2202 and claims all benefits of the Wrongful Death Act on behalf of herself and all other persons entitled to recover under the law, including Glantz's father, Mark Gardner.

107.    By reason of Glantz's tragic death, his Administratrix and/or his beneficiaries have suffered pecuniary losses and seek recovery of all medical, funeral, and administration expenses incurred as well as lost support, comfort, society, companionship, guidance, solace, protection and other services Glantz would have provided during his lifetime.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

<u>**SECOND CAUSE OF ACTION - SURVIVAL ACTION**</u>
<u>**PLAINTIFF V. DEFENDANTS**</u>

108.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

109.    Plaintiff brings this action on behalf of the Estate of Elliot Glantz by virtue of 42 Pa. C.S.A. §8302 and claims all benefits of the Survival Act on behalf of herself and all other persons entitled to recover under the law, including Glantz's father, Mark Gardner.

110.    Plaintiff claims on behalf of Glantz all damages suffered, including, but not limited to, significant conscious pain and suffering, catastrophic and fatal physical injuries and mental anguish, great fright, scarring, disfigurement, embarrassment, humiliation, loss of ability to enjoy life's pleasures, as well as the loss of future earning capacity from September 29, 2020 onwards.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

In accordance with the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all counts and issues raised herein.

**EISENBERG, ROTHWEILER,
WINKLER, EISENBERG & JECK, PC.**

By:   s/Todd A. Schoenhaus
NANCY J. WINKLER, ESQUIRE
TODD A. SCHOENHAUS, ESQUIRE
1634 Spruce Street
Philadelphia, PA 19103
(215) 546-6636
(215) 546-3641 fax
Attorneys for Plaintiff

Dated: September 28, 2022

# EXHIBIT "A"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DELENE GLANTZ, both individually | : | |
| and as the Administratrix of the ESTATE | : | |
| OF ELLIOT K. GLANTZ | : | |
| 725 Palmer Street | : | |
| Portsmouth, VA 23704 | : | |
| Plaintiff | : | Docket No.: |
| v. | : | |
| | : | |
| MONTGOMERY COUNTY | : | |
| One Montgomery Plaza | : | |
| 425 Swede Street | : | **JURY TRIAL DEMANDED** |
| Norristown, PA 19401 | : | |
| | : | |
| and | : | |
| | : | |
| MAJOR SEAN SMITH | : | |
| c/o MONTGOMERY COUNTY | : | |
| CORRECTIONAL FACILITY | : | |
| 60 Eagleville Road | : | |
| Eagleville, PA 19403 | : | |
| | : | |
| and | : | |
| | : | |
| CORRECTIONAL OFFICER | : | |
| TONY SHADE | : | |
| c/o MONTGOMERY COUNTY | : | |
| CORRECTIONAL FACILITY | : | |
| 60 Eagleville Road | : | |
| Eagleville, PA 19403 | : | |
| | : | |
| and | : | |
| | : | |
| CORRECTIONAL OFFICER | : | |
| RILEY SINNER | : | |
| c/o MONTGOMERY COUNTY | : | |
| CORRECTIONAL FACILITY | : | |
| 60 Eagleville Road | : | |
| Eagleville, PA 19403 | : | |
| | : | |
| and | : | |
| | : | |

CORRECTIONAL OFFICER JOSEPH : 
BELLISSIMO :
c/o MONTGOMERY COUNTY :
CORRECTIONAL FACILITY :
60 Eagleville Road :
Eagleville, PA 19403 :
:
    and :
:
CORRECTIONAL OFFICER :
J. SUBRAMANI :
c/o MONTGOMERY COUNTY :
CORRECTIONAL FACILITY :
60 Eagleville Road :
Eagleville, PA 19403 :
:
    and :
:
CORRECTIONAL OFFICERS :
JOHN/JANE DOES (1-10) (fictitious) :
c/o MONTGOMERY COUNTY :
CORRECTIONAL FACILITY :
60 Eagleville Road :
Eagleville, PA 19403 :
:
    and :
:
PRIMECARE MEDICAL, INC. :
3940 Locust Lane :
Harrisburg, PA 17109 :
:
    and :
:
MARISA FRIEDMAN, Psy.D. :
c/o PRIMECARE MEDICAL, INC. :
3940 Locust Lane :
Harrisburg, PA 17109 :
:
    and :
:
EMILY SCORDELLIS, Psy.D. :
c/o PRIMECARE MEDICAL, INC, :
3940 Locust Lane :
Harrisburg, PA 17109 :
:

2

|  and | : |
|  | : |
| MEDICAL PROVIDERS | : |
| JOHN/JANE DOES (1-10) (fictitious) | : |
| c/o PRIMECARE MEDICAL, INC. | : |
| 3940 Locust Lane | : |
| Harrisburg, PA 17109 | : |
|  | : |
| Defendants | : |

## CERTIFICATE OF MERIT AS TO
## DEFENDANT, PRIMECARE MEDICAL, INC

I, Todd A. Schoenhaus, Esquire, certify that:

 X    an appropriate licensed professional(s) has supplied a written statement(s) to the

undersigned that there is a basis to conclude that the care, skill or knowledge exercised or

exhibited by this Defendant in the treatment, practice or work that is the subject matter of the

Complaint, fell outside acceptable professional standards and that such conduct was a cause in

bringing about the harm;

AND/OR

 X    the claim that this Defendant deviated from an acceptable professional standard is based

solely on allegations that other licensed professionals for whom this Defendant is responsible

deviated from an acceptable professional standards and  an appropriate license professional(s)

has supplied a written statement(s) to the undersigned that there is a basis to conclude that the

care, skill or knowledge exercised or exhibited by the other licensed professionals in the

treatment, practice or work that is the subject of the Complaint, fell outside acceptable

professional standards and that such conduct was a cause in bringing about the harm;

OR

3

___expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim against this Defendant.

**EISENBERG, ROTHWEILER,**
**WINKLER, EISENBERG & JECK, PC**


By: ___s/Todd A. Schoenhaus_____
  NANCY J. WINKLER, ESQUIRE
  TODD A. SCHOENHAUS, ESQUIRE
  1634 Spruce Street
  Philadelphia, PA 19103
  (215) 546-6636
  (215) 546-3641 fax
  Attorneys for Plaintiff

Dated: September 28, 2022

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DELENE GLANTZ, both individually | : | |
| and as the Administratrix of the ESTATE | : | |
| OF ELLIOT K. GLANTZ | : | |
| 725 Palmer Street | : | |
| Portsmouth, VA 23704 | : | |
| Plaintiff | : | Docket No.: |
| v. | : | |
| | : | |
| MONTGOMERY COUNTY | : | |
| One Montgomery Plaza | : | |
| 425 Swede Street | : | **JURY TRIAL DEMANDED** |
| Norristown, PA  19401 | : | |
| | : | |
| and | : | |
| | : | |
| MAJOR SEAN SMITH | : | |
| c/o MONTGOMERY COUNTY | : | |
| CORRECTIONAL FACILITY | : | |
| 60 Eagleville Road | : | |
| Eagleville, PA 19403 | : | |
| | : | |
| and | : | |
| | : | |
| CORRECTIONAL OFFICER | : | |
| TONY SHADE | : | |
| c/o MONTGOMERY COUNTY | : | |
| CORRECTIONAL FACILITY | : | |
| 60 Eagleville Road | : | |
| Eagleville, PA 19403 | : | |
| | : | |
| and | : | |
| | : | |
| CORRECTIONAL OFFICER | : | |
| RILEY SINNER | : | |
| c/o MONTGOMERY COUNTY | : | |
| CORRECTIONAL FACILITY | : | |
| 60 Eagleville Road | : | |
| Eagleville, PA 19403 | : | |
| | : | |
| and | : | |
| | : | |

CORRECTIONAL OFFICER JOSEPH         :
BELLISSIMO                          :
c/o MONTGOMERY COUNTY               :
CORRECTIONAL FACILITY               :
60 Eagleville Road                  :
Eagleville, PA 19403                :
                                    :
    and         :
                                    :
CORRECTIONAL OFFICER                :
J. SUBRAMANI                        :
c/o MONTGOMERY COUNTY               :
CORRECTIONAL FACILITY               :
60 Eagleville Road                  :
Eagleville, PA 19403                :
                                    :
    and         :
                                    :
CORRECTIONAL OFFICERS               :
JOHN/JANE DOES (1-10) (fictitious)  :
c/o MONTGOMERY COUNTY               :
CORRECTIONAL FACILITY               :
60 Eagleville Road                  :
Eagleville, PA 19403                :
                                    :
    and         :
                                    :
PRIMECARE MEDICAL, INC.             :
3940 Locust Lane                    :
Harrisburg, PA 17109                :
                                    :
    and         :
                                    :
MARISA FRIEDMAN, Psy.D.             :
c/o PRIMECARE MEDICAL, INC.         :
3940 Locust Lane                    :
Harrisburg, PA 17109                :
                                    :
    and         :
                                    :
EMILY SCORDELLIS, Psy.D.            :
c/o PRIMECARE MEDICAL, INC,         :
3940 Locust Lane                    :
Harrisburg, PA 17109                :
                                    :
    and         :

2

```
                                              :
MEDICAL PROVIDERS                             :
JOHN/JANE DOES (1-10) (fictitious)            :
c/o PRIMECARE MEDICAL, INC.                   :
3940 Locust Lane                              :
Harrisburg, PA 17109                          :
                                              :
                        Defendants
```

## CERTIFICATE OF MERIT AS TO
## DEFENDANT, MARISA FRIEDMAN, Psy.D.

I, Todd A. Schoenhaus, Esquire, certify that:

  __X__  an appropriate licensed professional(s) has supplied a written statement(s) to the

undersigned that there is a basis to conclude that the care, skill or knowledge exercised or

exhibited by this Defendant in the treatment, practice or work that is the subject matter of the

Complaint, fell outside acceptable professional standards and that such conduct was a cause in

bringing about the harm;

AND/OR

____  the claim that this Defendant deviated from an acceptable professional standard is based

solely on allegations that other licensed professionals for whom this Defendant is responsible

deviated from an acceptable professional standards and  an appropriate license professional(s)

has supplied a written statement(s) to the undersigned that there is a basis to conclude that the

care, skill or knowledge exercised or exhibited by the other licensed professionals in the

treatment, practice or work that is the subject of the Complaint, fell outside acceptable

professional standards and that such conduct was a cause in bringing about the harm;

OR

___expert testimony of an appropriate licensed professional is unnecessary for prosecution of the

claim against this Defendant.

3

**EISENBERG, ROTHWEILER,**
**WINKLER, EISENBERG & JECK, PC**

By: ___s/Todd A. Schoenhaus_____
      NANCY J. WINKLER, ESQUIRE
      TODD A. SCHOENHAUS, ESQUIRE
      1634 Spruce Street
      Philadelphia, PA 19103
      (215) 546-6636
      (215) 546-3641 fax
      Attorneys for Plaintiff

Dated: September 28, 2022

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DELENE GLANTZ, both individually      :
and as the Administratrix of the ESTATE   :
OF ELLIOT K. GLANTZ                   :
725 Palmer Street                     :
Portsmouth, VA 23704                  :
                           Plaintiff  :   Docket No.:
        v.                            :
                                      :
MONTGOMERY COUNTY                     :
One Montgomery Plaza                  :
425 Swede Street                      :   **JURY TRIAL DEMANDED**
Norristown, PA  19401                 :
                                      :
    and                               :
                                      :
MAJOR SEAN SMITH                      :
c/o MONTGOMERY COUNTY                 :
CORRECTIONAL FACILITY                 :
60 Eagleville Road                    :
Eagleville, PA 19403                  :
                                      :
    and                               :
                                      :
CORRECTIONAL OFFICER                  :
TONY SHADE                            :
c/o MONTGOMERY COUNTY                 :
CORRECTIONAL FACILITY                 :
60 Eagleville Road                    :
Eagleville, PA 19403                  :
                                      :
    and                               :
                                      :
CORRECTIONAL OFFICER                  :
RILEY SINNER                          :
c/o MONTGOMERY COUNTY                 :
CORRECTIONAL FACILITY                 :
60 Eagleville Road                    :
Eagleville, PA 19403                  :
                                      :
    and                               :
                                      :

CORRECTIONAL OFFICER JOSEPH      :
BELLISSIMO                       :
c/o MONTGOMERY COUNTY            :
CORRECTIONAL FACILITY            :
60 Eagleville Road               :
Eagleville, PA 19403             :
                                 :
        and                      :
                                 :
CORRECTIONAL OFFICER             :
J. SUBRAMANI                     :
c/o MONTGOMERY COUNTY            :
CORRECTIONAL FACILITY            :
60 Eagleville Road               :
Eagleville, PA 19403             :
                                 :
        and                      :
                                 :
CORRECTIONAL OFFICERS            :
JOHN/JANE DOES (1-10) (fictitious) :
c/o MONTGOMERY COUNTY            :
CORRECTIONAL FACILITY            :
60 Eagleville Road               :
Eagleville, PA 19403             :
                                 :
       and                       :
                                 :
PRIMECARE MEDICAL, INC.          :
3940 Locust Lane                 :
Harrisburg, PA 17109             :
                                 :
       and                       :
                                 :
MARISA FRIEDMAN, Psy.D.          :
c/o PRIMECARE MEDICAL, INC.      :
3940 Locust Lane                 :
Harrisburg, PA 17109             :
                                 :
       and                       :
                                 :
EMILY SCORDELLIS, Psy.D.         :
c/o PRIMECARE MEDICAL, INC,      :
3940 Locust Lane                 :
Harrisburg, PA 17109             :
                                 :
       and                       :

|  | : |
| --- | --- |
| MEDICAL PROVIDERS | : |
| JOHN/JANE DOES (1-10) (fictitious) | : |
| c/o PRIMECARE MEDICAL, INC. | : |
| 3940 Locust Lane | : |
| Harrisburg, PA 17109 | : |
|  | : |
| Defendants |  |

## CERTIFICATE OF MERIT AS TO
## DEFENDANT, EMILY SCORDELLIS, Psy.D.

I, Todd A. Schoenhaus, Esquire, certify that:

___X__ an appropriate licensed professional(s) has supplied a written statement(s) to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by this Defendant in the treatment, practice or work that is the subject matter of the Complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm;

AND/OR

_____ the claim that this Defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this Defendant is responsible deviated from an acceptable professional standards and an appropriate license professional(s) has supplied a written statement(s) to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by the other licensed professionals in the treatment, practice or work that is the subject of the Complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm;

OR

___expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim against this Defendant.

3

**EISENBERG, ROTHWEILER,**
**WINKLER, EISENBERG & JECK, PC**


By:     s/Todd A. Schoenhaus
           NANCY J. WINKLER, ESQUIRE
           TODD A. SCHOENHAUS, ESQUIRE
           1634 Spruce Street
           Philadelphia, PA 19103
           (215) 546-6636
           (215) 546-3641 fax
           Attorneys for Plaintiff

Dated: September 28, 2022