**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DELENE GLANTZ, individually and as** : | |
| **Administratrix of the ESTATE OF** : | |
| **ELLIOT K. GLANTZ,** : | |
| **Plaintiff,** : | |
| **vs.** : | **Civil Action No. 22-3868** |
| : | |
| **MONTGOMERY COUNTY,** *et al.***,** : | |
| **Defendants.** : | |

## <u>O R D E R</u>

AND NOW, this _____ day of _____, 2022, upon consideration of the Motion of Defendants Montgomery County, Major Sean Smith, Correctional Officer Tony Shade, Correctional Officer Riley Sinner, Correctional Officer Joseph Bellissimo, and Correctional Officer J. Subramani to Dismiss Plaintiff's Complaint, as well as Plaintiff's response thereto, it is hereby ORDERED and DECREED that the motion is GRANTED.  Plaintiff's Complaint is DISMISSED as to Defendants Montgomery County, Major Sean Smith, Correctional Officer Tony Shade, Correctional Officer Riley Sinner, Correctional Officer Joseph Bellissimo, and Correctional Officer J. Subramani.

BY THE COURT:

_____
U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DELENE GLANTZ, individually and as Administratrix of the ESTATE OF ELLIOT K. GLANTZ, Plaintiff, vs. MONTGOMERY COUNTY, *et al.*, Defendants. | : : : : : : : : : : : |

Civil Action No. 22-3868

**MOTION OF DEFENDANTS MONTGOMERY COUNTY, MAJOR SEAN SMITH, CORRECTIONAL OFFICER TONY SHADE, CORRECTIONAL OFFICER RILEY SINNER, CORRECTIONAL OFFICER JOSEPH BELLISSIMO, AND CORRECTIONAL OFFICER J. SUBRAMANI TO DISMISS PLAINTIFF'S COMPLAINT**

Defendants Montgomery County, Major Sean Smith, Correctional Officer Tony Shade, Correctional Officer Riley Sinner, Correctional Officer Joseph Bellissimo, and Correctional Officer J. Subramani (the "County Defendants"), through their undersigned counsel, hereby move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint of plaintiff Delene Glantz ("Plaintiff"). In support of this motion, the County Defendants incorporate herein by reference the arguments and authorities set forth in their accompanying memorandum of law.

Respectfully submitted,
MONTGOMERY COUNTY SOLICITOR'S OFFICE

*/s/ Philip W. Newcomer*
Philip W. Newcomer, Esquire
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA 19404-0311
610-278-3033
*Counsel for the Montgomery County Defendants*

Dated: November 29, 2022

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DELENE GLANTZ, individually and as Administratrix of the ESTATE OF ELLIOT K. GLANTZ,          Plaintiff,     vs.    MONTGOMERY COUNTY, *et al.*,          Defendants. | Civil Action No. 22-3868 |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF DEFENDANTS MONTGOMERY COUNTY, MAJOR SEAN SMITH, CORRECTIONAL OFFICER TONY SHADE, CORRECTIONAL OFFICER RILEY SINNER, CORRECTIONAL OFFICER JOSEPH BELLISSIMO, AND CORRECTIONAL OFFICER J. SUBRAMANI TO DISMISS PLAINTIFF'S COMPLAINT**

## I.    <u>OVERVIEW OF THE ACTION</u>

Plaintiff Delene Glantz ("Plaintiff"), who is administratrix of the estate of Elliott K. Glantz ("Mr. Glantz"), bring this action under 42 U.S.C. § 1983, claiming that Mr. Glantz was denied mental health care in violation of his constitutional rights during an incarceration at the Montgomery County Correctional Facility ("MCCF"), allegedly resulting in his death by suicide on September 29, 2020.

The complaint asserts § 1983 claims against Montgomery County ("County") and five individuals who were employed as correctional staff at MCCF (collectively, the "County Defendants"). *See* Complaint (Exhibit A), Counts I & II. The complaint also asserts § 1983 claims against MCCF's medical care provider, PrimeCare Medical, Inc. and two psychologists (collectively, the "PrimeCare Defendants"), as well as state law claims for medical negligence

against the PrimeCare Defendants.[1]   The County Defendants now move for dismissal of Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6).

The complaint alleges that Mr. Glantz was first incarcerated at MCCF on September 5, 2020 as a pretrial detainee.  Exhibit A at ¶ 31.  Specifically, the complaint alleges that Mr. Glantz was detained at MCCF on that day for an alleged parole violation.  *Id*.  That allegation is incorrect.  In reality, Mr. Glantz was detained at MCCF on September 5, 2020 for new drug-related charges.  Either way – being arrested and confined on new charges or on an alleged parole violation – Mr. Glantz was a pretrial detainee at MCCF and not a convicted prisoner.

The complaint goes to great lengths to lay out Mr. Glantz's history of mental health issues as reflected in PrimeCare's records as medical care provider to the <u>Bucks County Correctional Facility</u>, where Mr. Glantz had been incarcerated on a number of prior occasions. *See* Exhibit A at ¶¶ 18-30.  <u>Absolutely no facts are pleaded, however, to demonstrate that any official or employee of *Montgomery County* had knowledge of Mr. Glantz's mental health history</u>.  The complaint alleges that Mr. Glantz "had been incarcerated over 23 previous times" (*id*. at ¶ 38), but none of those prior incarcerations are alleged to have been at MCCF.  This was Mr. Glantz's first incarceration in Montgomery County.

The complaint acknowledges that Mr. Glantz was given an intake medical screening by PrimeCare personnel upon his arrival at MCCF.  *See* Exhibit A at ¶¶ 32-33.  At intake, Mr. Glantz "denied any prior suicide attempts or ideations."  *Id*. at ¶ 32.  Mr. Glantz was ordered by PrimeCare personnel to undergo alcohol detoxification, and he underwent daily medical checks over the course of the next five days as a result. *Id*. at ¶ 34.  Mr. Glantz was non-compliant with

---

[1] The PrimeCare Defendants are represented by John R. Ninosky, Esquire of Marshall Dennehey Warner Coleman & Goggin.

his detoxification medications, and he was assessed by a PrimeCare physician's assistant as a result on September 10, 2020.  *Id*. at ¶ 35.  At that time, according to PrimeCare's records, Mr. Glantz "continued to deny any mental health issues."  *Id*.

On September 11, 2020, PrimeCare set up a mental health appointment for Mr. Glantz because he "was scheduled to see a psychiatrist" for "mood swings and sleep" before his incarceration.  Exhibit A at ¶ 36.  On September 14, "mild anxiety" was noted during Mr. Glantz's detoxification check.  *Id*. at ¶ 37.  On September 16, Mr. Glantz was evaluated by a PrimeCare psychologist – Dr. Friedman – who assessed Mr. Glantz as having an unspecified mood disorder and referred Mr. Glantz for further mental health follow-up "as needed."  *Id*. at ¶¶ 38-40.  No medications were ordered.  *Id*. at ¶ 40.  Of particular importance, no suicide precautions were ordered for Mr. Glantz.  *Id*. at ¶ 85.

On September 21, 2020, a second PrimeCare psychologist – Dr. Scordellis – approved and cosigned Dr. Friedman's notes from the evaluation of Mr. Glantz.  Exhibit A at ¶ 41.  On the same day, Mr. Glantz was moved from intake quarantine housing to a general population housing section – C2, cell 86.  *Id*. at ¶ 42.  A PrimeCare nurse collected a COVID nasal swab at that time, which is alleged to have been Mr. Glantz's "last documented clinician encounter prior to Glantz's hanging a week later."  *Id*.

Tragically, Mr. Glantz committed suicide by hanging himself in his cell on the morning of September 29, 2020.  At 5:53 that morning, CO Subramani conducted a routine tour of the C2 housing section and recorded that there were "[n]o issues to report."  Exhibit A at ¶ 46.  CO Subramani described that tour in his incident report concerning Mr. Glantz's death, stating, "While conducting a routine tour in C-2, I visually observed inmate Glantz, Elliott in his bed and he appeared to be asleep and in no form of distress."  *Id*.  A shift change then occurred at 6:00

3

AM.  CO Shade, who was the incoming control booth officer, toured C Pod at 6:03 AM and reported "all inmates secure" before taking his post in the control booth.  *See Id*. at ¶ 47. Approximately a half hour later, at 6:32 AM, CO Sinner distributed meal trays to C Pod.  *Id*.

At about 6:35 AM, CO Shade "started to click C2 86 cell because inmate Glantz, Elliott had not gotten up for breakfast trays."[2]  Exhibit A at ¶49.  Thereafter, two inmates went over to Mr. Glantz's cell, turned on the lights, and reported to CO Shade that Mr. Glantz was dead.[3]  *Id*. CO Shade then called a medical emergency from his post in the control booth.  "CO Bellissimo and CO Sinner responded and observed Glantz hanging from a bedsheet affixed around his neck and attached to the top of the bed frame in his single-person cell."  *Id*. at ¶ 50.  CO Sinner retrieved a cutdown tool from the C Pod control booth and COs Sinner and Bellissimo cut Mr. Glantz down and placed him on the floor.  *Id*. at ¶ 51.  Blood was coming from Mr. Glantz's nose and mouth.  *Id*.  Major Smith arrived, and he "began CPR, before giving way to prison medical staff and then township paramedics."  *Id*.

The complaint alleges that Mr. Glantz was pronounced dead at the scene at 6:58 AM. Exhibit A at ¶ 53.  The complaint further alleges that the coroner's examination later found that the body "was already exhibiting obvious lividity and early onset of rigor mortis[.]"  *Id*. at ¶ 54. The coroner's report drew no conclusions about the timing of Mr. Glantz's death, but Plaintiff's

---

[2] A CO can use the controls in a housing section's control booth to cause the door of a cell to make a loud clicking noise.  A control booth officer "clicks" a cell to get the attention of an inmate in the cell.

[3] The complaint alleges that, during pre-complaint discovery, "the County refused heretofore to produce video recordings, which presumably will either corroborate or contradict CO Shade's account."  Exhibit A at pg. 11 n.3.  That statement is false.  During pre-complaint discovery, the County twice offered to make all video evidence available for viewing in the Solicitor's Office. Inexplicably, Plaintiff's counsel never responded to the offers.

complaint nevertheless theorizes, without stating any basis therefor, that "Glantz had already been dead for at least 1-2 hours." *Id.*

The complaint attempts to link Mr. Glantz's suicide to other deaths, some suicides and some not, that have occurred at MCCF and other county correctional facilities across Pennsylvania. Plaintiff alleges that there were 6 suicides by hanging at MCCF in the decade from 2007 to 2016, 2 more in 2017, 1 more in 2018, and at least 1 more in 2019. Exhibit A at ¶ 57. The complaint identifies only one prior suicide that was alleged to have involved a constitutional violation: that of David Minnich, which occurred in 2012 – nearly 8 years before Mr. Glantz's death.[4] *Id.* at ¶¶ 65-67. In the intervening years, the complaint acknowledges several suicide prevention initiatives that were undertaken at MCCF. The complaint acknowledges a 2016 suicide watch program that was credited with preventing 38 suicides that year. *Id.* at ¶ 58. The complaint further acknowledges that, in 2017, MCCF increased expenditures for psychiatric services and medical professional staffing, "increasing hours by around 43 percent."[5] *Id.* Further, the complaint acknowledges that, in April of 2018, MCCF

---

[4] Mr. Minnich's death resulted in a lawsuit filed in this district, *Minnich v. Montgomery County, et al.*, No. 2:14-cv-07236. This is the only lawsuit against the County concerning a suicide that is referenced in Plaintiff's complaint. The complaint does cite a number of other suits that either did not involve a suicide or did not even involve MCCF. Exhibit A at ¶¶ 68-74. Those suits are not material to the present action.

[5] As if to paint the County's increased spending on mental health services and staffing at MCCF as an insignificant percentage of MCCF's overall budget, the complaint states that "the County invested an additional $2 million in psychiatric services and medical professional staffing (from an annual budget believed to exceed $400 million)[.]" Exhibit A at ¶ 58 (emphasis added). MCCF's budget is exponentially smaller than $400 million. In 2017, when the increase was announced, the correctional facility's total expenditures were less than $40 million. *See* Montgomery County 2018 Budget Report, General Fund Departmental Expenditures, pg. 5, https://www.montcopa.org/DocumentCenter/View/19190/Montgomery-County-Proposed-2018-Budget-and-Capital-Improvement-Program?bidId= (as viewed 11/29/2022).

initiated additional suicide awareness and prevention training for its correctional officers.  *Id*. at ¶ 61.

As explained below, the complaint fails to state a plausible § 1983 claim against the individual County Defendants for a violation of Mr. Glantz's 14th Amendment rights.  Further, the complaint fails to state facts necessary to demonstrate a plausible claim that a policy or custom of the County caused Mr. Glantz's death, as is required by *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) to establish municipal liability under § 1983.  Finally, the complaint's requests for an award of punitive damages against the County must be stricken with prejudice, as such an award is barred as a matter of law by well-known Supreme Court precedent.  The County Defendants' motion to dismiss of Plaintiff's complaint should be granted in its entirety.

## II.   STANDARD OF REVIEW

The Supreme Court clarified the standard of review for a Rule 12(b)(6) motion in the much-discussed case of *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).  *Twombly* teaches that dismissal of a complaint is appropriate if, accepting as true all of the facts alleged in the complaint, the plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 570.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation [under Rule 8(a)(2)] to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and the formulaic recitation of the elements of a cause of action will not do."  *Id*. at 555-56 (citations omitted).  To survive a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]"  *Id*. at 555.  A plaintiff must have "nudged

[his] claim across the line from conceivable to plausible, or [his] complaint must be dismissed." *Id.* at 570.

The Supreme Court's subsequent opinion in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), establishes that the *Twombly* "facial plausibility" pleading requirement applies to all civil suits in the federal courts.   After *Iqbal,* it is clear that conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly,* 550 U.S. at 557).  To prevent dismissal, all civil complaints must now set out "sufficient factual matter" to show that the claim is facially plausible.  This "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

Analyzing *Twombly* and *Iqbal*, the Third Circuit has offered the following analysis of the process to be undertaken in deciding a motion to dismiss:

> Therefore, after *Iqbal*, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis.  First, the factual and legal elements of a claim should be separated.  The district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  *Id.*  Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'  *Id.* at 1950.  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts.  *See Phillips v. County of Allegheny*, 515 F.3d 224, 234-35.  As the Supreme Court instructed in *Iqbal*, '[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.' '  *Iqbal*, 129 S.Ct. at 1949.  This 'plausibility' determination will be 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'  *Id*.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  Applying this standard, the County Defendants' motion to dismiss Plaintiff's complaint should be granted.

7

III.    **ARGUMENT**

   A.    **The Complaint Fails To State A Plausible § 1983 Claim**
         **Against Any Of The Individual County Defendants.**

   In Count I of the complaint, Plaintiff purports to allege § 1983 claims against all defendants for the violation of Mr. Glantz's 14th Amendment rights, stating that:

> At all relevant times, Defendants, acting under color of law, were deliberately indifferent to Glantz's serious medical needs in violation on the Fourteenth Amendment's ban on cruel and unusual punishment.

Exhibit A at ¶ 82 (emphasis added).   Of course, it is the 8th Amendment, and not the 14th Amendment, that creates a right to be free from cruel and unusual punishment.   As a pretrial detainee, Mr. Glantz's constitutional rights while incarcerated are to be assessed by reference to the 14th Amendment's guarantee of due process.   *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) ("Because the case before us involves pretrial detainees, rather than convicted prisoners, our analysis must proceed under the Due Process Clause of the fourteenth amendment rather than the eighth amendment.").

   In *Inmates of Allegheny Cnty Jail*, *supra*, the Third Circuit found the standard set by *Estelle v. Gamble*, 429 U.S. 97 (1976) to be appropriate in evaluating claims that inadequate psychiatric care had been provided in a county correctional facility.   Under *Estelle*, failure to provide adequate treatment is a constitutional violation only when it results from "deliberate indifference to a serious medical need."   429 U.S. at 105.   To establish a violation of Mr. Glantz's constitutional right to adequate medical care, Plaintiff is required to point to facts that demonstrate: (1) he had a serious medical need, and (2) prison officials were deliberately indifferent to that need – *i.e.*, the prison officials subjectively knew of the deprivation and "disregard[ed] an excessive risk to [the] inmate['s] health or safety."   *Natale v. Camden County Correc. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

For a claim of deliberate indifference against a prison official to survive, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference[.]"  *Woloszyn v. County of Lawrence*, 396 F.3d 314, 321 (3d Cir. 2005) (emphasis added).  Under this standard, the complaint wholly fails to state a viable § 1983 claim against the five members of MCCF's correctional staff who have been named as individual defendants.  One must keep in mind that Mr. Glantz was housed in general population unit at the time of his suicide, not in a medical observation unit.  *See* Exhibit A at ¶ 42.  Mr. Glantz was placed in a general population housing unit after an evaluation by a PrimeCare psychologist.  *See Id*. at ¶¶ 37-41.  That psychologist did not prescribe any medication.  *Id*. at ¶ 40.  Nor were any suicide prevention measures of any kind ordered for Mr. Glantz.  *Id*. at ¶ 85.  The complaint plainly fails to allege facts to demonstrate that any of the five individual County Defendants knew Mr. Glantz to be at a substantial risk of serious harm on the morning of September 29, 2020 before he was discovered hanging in his cell.  At that point in time, a medical emergency was called immediately and correctional staff quickly responded, followed by PrimeCare medical staff and then township paramedics.

***Major Smith*** is merely alleged to have done two things.  First, he is alleged to have logged the decedent's phone calls into evidence post-incident.  Exhibit A at ¶ 45.  Second, he responded to Mr. Glantz's medical emergency and administered CPR "before giving way to prison medical staff and then township paramedics."  *Id*. at ¶ 51.  Such conduct is the polar opposite of deliberate indifference to a serious medical need.  It is bewildering at best that Major Smith has been sued for his efforts to save Mr. Glantz's life.

***CO Bellissimo*** is simply alleged to have responded to the medical emergency and, upon finding Mr. Glantz hanging in his cell, assisted in cutting down Mr. Glantz and placing him on

the floor so that medical attention could be rendered. Exhibit A at ¶¶ 50-51. No facts plausibly indicating deliberate indifference are alleged. As with Major Smith, CO Bellissimo should be commended for his actions instead of being forced to defend a lawsuit.

**CO Sinner** is alleged to have delivered breakfast trays to C Pod at approximately 6:32 AM. Exhibit A at ¶ 47. He returned to C Pod in response to the medical emergency and, with the help of CO Bellissimo, he cut down Mr. Glantz and placed him on the floor so that medical attention could be rendered. *Id*. at ¶¶ 50-51. Once again, the complaint alleges no facts plausibly indicating deliberate indifference on CO Sinner's part.

**CO Subramani** is alleged to have toured C Pod at approximately 5:53 AM, after which he reported that he found "[n]o issues to report." Exhibit A at ¶ 46. In a later incident report concerning Mr. Glantz's death, CO Subramani wrote that during that tour of C Pod, he "observed inmate Glantz, Elliott in his bed and he appeared to be asleep and in no form of distress." *Id*. No facts plausibly indicating deliberate indifference on the part of CO Subramani are alleged.

Finally, **CO Shade** was alleged to be the control booth officer for C Pod on the morning of Mr. Glantz's death. Exhibit A at ¶ 47. He toured C Pod at 6:03 AM and reported that he found "all inmates secure." *Id*. At approximately 6:35 AM, CO Shade began to "click" Mr. Glantz's cell because he had not come out of his cell for his breakfast tray. *Id*. at ¶ 49. Two inmates then went to Mr. Glantz's cell, turned on the lights, and told CO Shade that they believed Mr. Glantz was dead. *Id*. CO Shade called a medical emergency as a result. No facts plausibly indicating deliberate indifference on the part of CO Shade are alleged.

In sum, the complaint fails to assert facts to demonstrate it to be plausible that any of the individual County Defendants was deliberately indifferent to a serious medical risk to Mr.

Glantz's safety of which they were subjectively aware.  The complaint should be dismissed as to Defendants Smith, Bellissimo, Sinner, Subramani and Shade.

      **B.**      **The Complaint Fails To State A Plausible**
              **§ 1983 Claim Against The County Under *Monell.***

      Counts I and II of the complaint both seek to seek to assert claims under § 1983 against the County for the alleged violation of Mr. Glantz's 14th Amendment rights.  Under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), a plaintiff may maintain a § 1983 action against local government such as the County only where the County's own "policy or custom" causes a deprivation of constitutional rights.  436 U.S. at 694 (a local government has no vicarious or *respondeat superior* liability under § 1983; liability can only arise from the government's own policy or custom).  A local government's "policy" is a "statement, ordinance, regulation or decision officially adopted and promulgated by [a local governing] body's officers." *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059 (3d Cir.1991) (citing *Monell*, 436 U.S. at 690).  A local government's "custom," which lacks the formal approval of a policy, requires a showing of practices that are "so permanent and well settled to constitute a custom or usage with the force of law." *Id.* (citing *Monell*, 436 U.S. at 691).

      The local government's policy or custom must be the "moving force" behind the constitutional deprivation if the local government is to be held liable.  *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *Grazier v. City of Philadelphia*, 328 F.3d 120, 125 (3d Cir. 2003).  There must be "a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation' to ground municipal liability." *Jiminez v. All American Rathskeller, Inc.,* 503 F.3d 247, 249-50 (3d Cir. 2007) (quoting *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)).  As explained below, the complaint does not allege sufficient facts to demonstrate it to be plausible that Mr. Glantz's death was caused by a policy or custom of the County.

### 1.     Formal Policy

With regard to formal policies of the County, the complaint alleges, in boilerplate fashion, that:

> The violations of Glantz's constitutional rights as set forth above were directly and proximately caused by the encouragement, tolerance, ratification of, and *deliberate indifference of the County* and its private mental health provider *to the policies* and practices of their agents and employees of refusing, delaying, interfering with, or negligently providing timely and appropriate medical care and treatment to those in special need like Glantz

Exhibit A at ¶ 94 (emphasis added).

Despite having the benefit of taking pre-complaint state court discovery prior to filing her complaint, Plaintiff does not identify or state the contents of any formal policy that allegedly caused a delay, interference with, or negligent provision of mental health care to Mr. Glantz. The complaint does not identify any alleged individual or authority connected to the formation and implementation of such a policy, does not identify the source of the policy's official adoption, does not identify the alleged deficiency in the policy, does not set forth circumstances that constitute deliberate indifference pertaining to the policy, and does not describe the causal relationship between the policy and the death of Mr. Glantz.  It is not enough to make a purely conclusory allegation of the existence of deficient County policies; the complaint must demonstrate with its facts that an identified policy was the cause of Plaintiff's injury.  *See Twombly, supra*; *Iqbal, supra*.  Plaintiff does not do so here.  The complaint lacks facts necessary to demonstrate a plausible *Monell* claim against the County on the basis of a municipal policy.

### 2.     Custom

The complaint not only fails to state a *Monell* claim on the basis of formal policy, but it also lacks the facts necessary to demonstrate it to be plausible that Mr. Glantz's death was

caused by a County custom that was "so permanent and well settled as to virtually constitute law." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 263 (3d Cir. 2010).

The complaint does not allege facts to demonstrate any identified "custom" – that is, any wide-spread practice so permanent and well-settled as to virtually constitute law. The complaint does not describe any individuals or authorities connected to the formation and implementation of any custom. The complaint does not describe the circumstances that have caused the informal adoption or formation of any alleged custom. Moreover, the complaint does not describe how any custom was the moving cause of the death of Mr. Glantz.

"There is no bright line rule which establishes how widespread a practice must be [to become a "custom"], but courts have held that a single instance is not enough." *Washington-Pope v. City of Philadelphia*, No. 12-4300, 2015 U.S. Dist. LEXIS 158522, *35 (E.D. Pa. Nov. 23, 2015); *see also City of Oklahoma v. Tuttle*, 471 U.S. 808, 821 (1985) (striking down a jury instruction that had "allowed the jury to impose liability on the basis of … a single incident"); *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989) (a single incident ordinarily "does not suffice to establish either an official policy or a custom"); *Wilson v. Cook County,* 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident – or even three incidents – do not suffice."). Besides the death of Mr. Glantz, the only other identifiable suicide at MCCF mentioned in the complaint was that of David Minnich some 8 years earlier. *See* Exhibit A at ¶¶ 65-67. Two suicides, nearly 8 years apart, which resulted in lawsuits in which deliberate indifference was alleged, are insufficient in and of themselves to demonstrate a permanent and well-settled municipal custom. The complaint simply lacks facts necessary to

demonstrate it to be plausible that the death of Plaintiff's decedent was caused by a custom of the County. *See Twombly, supra*; *Iqbal, supra*.

### 3. Failure To Train Or Supervise

In certain limited circumstances, "[m]unicipal liability can be predicated upon a failure to train." *Woloszyn*, 396 F.3d at 324. The Supreme Court has observed, though, that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The Supreme Court has held that:

> [o]nly where a municipality's failure to train its employees in relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983. ... Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality -- a 'policy' as defined by our prior cases -- can a city be liable for such a failure under § 1983.

*City of Canton,* 489 U.S. at 389. "Mere proof that an injury could have been avoided if the municipal officer or employee had better or more training is not enough to show municipal liability under a 'failure to train' *Monell* claim. Instead, plaintiff must show that the training deficiency was the actual cause of the violation of Plaintiffs' civil rights." *White v. Brommer,* 747 F. Supp.2d 447, 463 n. 42 (E.D. Pa. 2010) (citing *City of Canton,* 489 U.S. at 390-91). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for ... failure to train." *Connick*, 563 U.S. at 62 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)).

In the present case, the complaint makes broad-brush, conclusory allegations that the County was deliberately indifferent "to the need for hiring, training, supervision, investigation, monitoring, and/or discipline with respect to the provision of specialized medical care to inmates such as Glantz." Exhibit A at ¶ 93. The complaint goes on to allege that the County "knew or

14

certainly should have known of the need to improve and correct failed hiring, training, supervision, investigation, monitoring, discipline, policies, and practices[.]"  *Id*. at ¶ 96.  These boilerplate allegations, however, are not enough.  Facts demonstrating a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for failure to train (*see Connick,* 563 U.S. at 62), but no such pattern of similar constitutional violations is alleged here.  Further, the complaint fails to plead facts demonstrating that any alleged failure to train "reflects a 'deliberate' or 'conscious' choice" by the County – "a 'policy' as defined by our prior cases[.]"  *City of Canton,* 489 U.S. at 389.  Moreover, the complaint does not show, with facts, that any training deficiency was the actual cause of a violation of Mr. Glantz's civil rights.  *See White,* 747 F. Supp.2d at 463 n.42 (citing *City of Canton,* 489 U.S. at 390-91).

"Similarly, to properly allege failure to supervise under *Monell*, the Third Circuit has required a plaintiff to show that a municipality has 'contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate.'"  *Simpson v. Ferry*, 202 F. Supp.3d 444, 455 (E.D. Pa. 2016) (quoting *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998)).  "Policymakers['] 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action — the 'deliberate indifference' — necessary to trigger municipal liability.'" *Buoniconti v. City of Philadelphia*, 148 F. Supp.3d 425, 440 (E.D. Pa. 2015) (quoting *Brown*, 520 U.S. at 407).

Here, with respect to any alleged failure to supervise, the complaint does not set forth facts to demonstrate, as the Third Circuit requires, that the policy-makers of the County had "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery*, 159 F.3d at 127.

The bottom line is that no facts are stated in the complaint to demonstrate that an unconstitutional deficiency in training or supervision was the plausible moving cause of the alleged wrongful death at issue. The complaint fails to state facts necessary to demonstrate a plausible *Monell* claim against the County, as *Twombly, supra* and *Iqbal, supra* require. Plaintiff's complaint should be dismissed as to the County.

### C. The Complaint's Prayer For Punitive Damages Must Be Stricken With Prejudice As To The County.

Both Counts I and II of the complaint are directed to the County and assert claims under 42 U.S.C. § 1983. The prayer for relief in each of these counts seeks, *inter alia*, an award of punitive damages. Exhibit A at pgs. 22 & 23. Under well-established Supreme Court precedent, however, punitive damages are not available against a local government defendant under 42 U.S.C. § 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("we hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983"). The complaint's requests for punitive damages must be stricken with prejudice as to the County.

## IV.   CONCLUSION

For the foregoing reasons, Defendants Montgomery County, Major Sean Smith, Correctional Officer Tony Shade, Correctional Officer Riley Sinner, Correctional Officer Joseph

Bellissimo, and Correctional Officer J. Subramani request that their Rule 12(b)(6) motion be granted in its entirety and that Plaintiff's complaint be dismissed as to the County Defendants.

Respectfully submitted,
MONTGOMERY COUNTY SOLICITOR'S OFFICE

*/s/ Philip W. Newcomer*
Philip W. Newcomer, Esquire
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA  19404-0311
610-278-3033

Counsel for Defendants,
Montgomery County, Major Sean Smith,
Correctional Officer Tony Shade,
Correctional Officer Riley Sinner,
Correctional Officer Joseph Bellissimo, and
Correctional Officer J. Subramani

Dated:  November 29, 2022

17

## **CERTIFICATE OF SERVICE**

I, Philip W. Newcomer, hereby certify that the Motion of Defendants Montgomery County, Major Sean Smith, Correctional Officer Tony Shade, Correctional Officer Riley Sinner, Correctional Officer Joseph Bellissimo, and Correctional Officer J. Subramani to Dismiss Plaintiff's Complaint was served electronically on the 29th day of November, 2022 via the Court's ECF System, upon the following counsel of record:

Nancy J. Winkler, Esquire
Todd A. Schoenhaus, Esquire
Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, PC
1634 Spruce Street
Philadelphia, PA 19103
*Counsel for Plaintiff*

John R. Ninosky, Esquire
Marshall Dennehey Warner Coleman & Goggin
100 Corporate Center Drive
Suite 201
Camp Hill, PA  17011
*Counsel for Defendant PrimeCare Medical, Inc.*

*/s/ Philip W. Newcomer*
Philip W. Newcomer, Esquire