## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DELENE GLANTZ, both individually and as the Administratrix of the ESTATE OF ELLIOT K. GLANTZ,**<br>      **Plaintiff,** | **CIVIL ACTION** |
| **v.** | **NO.  22-3868** |
| **MONTGOMERY COUNTY,**<br>**MAJOR SEAN SMITH,**<br>**CORRECTIONAL OFFICER TONY SHADE,**<br>**CORRECTIONAL OFFICER RILEY SINNER,**<br>**CORRECTIONAL OFFICER JOSEPH BELLISSIMO,**<br>**CORRECTIONAL OFFICER J. SUBRAMANI,**<br>**CORRECTIONAL OFFICERS JOHN/JANE DOES (1-10),**<br>**PRIMECARE MEDICAL, INC.,**<br>**MARISA FRIEDMAN, PSY.D.,**<br>**EMILY SCORDELLIS, PSY.D., and**<br>**MEDICAL PROVIDERS JOHN/JANE DOES (1-10),**<br>      **Defendants.** | |

### MEMORANDUM

**HODGE, J.**                                                                           **July 17, 2024**

Plaintiff Delene Glantz brought a civil rights survival and wrongful death action arising

out of her son's, Elliot K. Glantz ("Mr. Glantz"), death while he was in custody at the Montgomery

County Correctional Facility in Eagleville, Pennsylvania ("MCCF"). (*See generally* ECF No. 1.)

Plaintiff files suit as the administratrix of the estate of Elliot K. Glantz against several defendants,

including Montgomery County (the "County"), Major Sean Smith, Correctional Officer Tony

Shade, Correctional Officer Riley Sinner, Correctional Officer Joseph Bellissimo, and

Correctional Officer J. Subramani (collectively, the "County Defendants") and PrimeCare Medical, Inc. ("PrimeCare"), Marisa Friedman, Psy.D., and Emily Scordellis, Psy.D. (collectively, the "Medical Defendants") (collectively, "Defendants"). (*See id.*) In her Complaint, Plaintiff asserts three counts: (1) a Fourteenth Amendment claim against all Defendants (Count I), (2) *Monell* claims against the County and PrimeCare (Count II), and (3) a state law medical negligence claim against the Medical Defendants (Count III). (*See id.*)

Presently before the Court are the County Defendants' Motion to Dismiss and the Medical Defendants' Partial Motion to Dismiss. (ECF Nos. 10–11.) Plaintiff opposes the motions. (ECF Nos. 12–13.) For the reasons that follow, the Court grants in part and denies in part the motions to dismiss.

## I. BACKGROUND

### A. Factual Background[1]

On or about September 5, 2020, Mr. Glantz was detained at MCCF as a pretrial detainee. (ECF No. 1 at 8 ¶ 31.) PrimeCare personnel conducted Mr. Glantz's initial medical screening upon his arrival at MCCF. (*Id.* ¶ 32.) At intake, Mr. Glantz admitted to alcohol dependency but "denied any other medical history including mental health, as well as any prior suicide attempts or ideations." (*Id.*) However, this information from Mr. Glantz was contrary to his mental health history. Mr. Glantz was previously incarcerated at the Bucks County Correctional Facility ("BCCF") on numerous prior occasions. (*See generally id.* at 6–8 ¶¶ 19–30.) PrimeCare is also the medical care provider at BCCF. (*See id.* at 6 ¶ 19.) Plaintiff alleges that according to PrimeCare's records from 2017 to 2020, Mr. Glantz had an extensive documented mental health history while incarcerated at BCCF, including (1) notes regarding a history of treatment with a psychiatrist, Penn

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

Foundation, Inc., and Horsham Clinic; (2) diagnoses of bipolar, ADHD, depression, and anxiety; (3) observations that Mr. Glantz may be minimizing his disorder, symptoms, and history; (4) a documented history of prior suicide attempts and suicidal ideation; and (5) notes regarding previous medications for his diagnoses. (*See id.* at 6–8 ¶¶ 19–30.)

Mr. Glantz's prior commitments at BCCF were noted in his file, and he signed a form "authorizing PrimeCare to obtain his medical records from all other health care providers, without limitation." (*Id.* at 8 ¶ 33.) Otherwise, Mr. Glantz's statements at intake were accepted as true, and he was ordered by PrimeCare personnel to undergo alcohol detoxification for which Mr. Glantz underwent daily checks for the next five (5) days. (*Id.* ¶ 34.) On September 10, 2020, Mr. Glantz was assessed by PrimeCare personnel in response to a sick call request. (*Id.* at 8–9 ¶ 35.) On September 11, 2020, a mental health appointment was created for Mr. Glantz for "mood swings and sleep;" no medications were ordered. (*Id.* at 9 ¶ 36.) On September 14, 2020, mild anxiety was noted during a detoxification check. (*Id.* ¶ 37.)

On September 16, 2020, Mr. Glantz was evaluated by Defendant Dr. Friedman, and she learned about Mr. Glantz's undisclosed methamphetamine use and extensive mental health history, including prior mental health treatment, inconsistent history with psychotropic medications, and diagnoses. (*Id.* ¶¶ 38–39.) Mr. Glantz also complained of current symptoms of mood swings and racing thoughts. (*Id.* ¶ 39.) However, Mr. Glantz still did not reveal any suicidal ideations or a history of suicide attempts. (*Id.*) Defendant Friedman assessed Mr. Glantz with an unspecified mood disorder and referred him to psychiatry for follow-up "as needed." (*Id.* at 9–10 ¶ 40.) Mr. Glantz was originally scheduled to be seen by psychiatry on September 28, 2020, and a follow-up mental health appointment was scheduled for October 1, 2020, for after Mr. Glantz was seen by psychiatry. (*Id.*) Defendant Friedman did not order any medications. (*Id.*) Defendant Dr. Scordellis

approved and cosigned Defendant Friedman's notes on September 21, 2020. (*Id.* at 10 ¶ 41.) Also on September 21, 2020, Mr. Glantz was seen by a nurse for a COVID test in order to be moved from intake housing quarantine to a general population housing section; this was Mr. Glantz's last documented contact with a clinician. (*Id.* ¶ 42.)

On an unknown date and for an unknown reason, Mr. Glantz's psychiatry appointment for September 28, 2020 was canceled. (*Id.* ¶ 43.) On the morning of September 28, 2020, Mr. Glantz spoke with his parents on the phone. (*Id.* ¶ 44.) On the afternoon of September 28, 2020, Mr. Glantz spoke with his friend, Kate Feathers, and "can be heard crying to her that he was 'so scared,' 'having nightmares,' and would rather be 'in the cold' than at MCCF." (*Id.* ¶ 45.) Defendant Major Smith logged this call as noteworthy in post-incident evidence. (*Id.*)

Tragically, Mr. Glantz committed suicide by hanging himself in his cell on the morning of September 29, 2020. At 5:53 that morning, Defendant Subramani conducted a routine tour of the C2 housing section and recorded that there were "[n]o issues to report." (*Id.* at 10–11 ¶ 46.) Post-incident, Defendant Subramani reported: "While conducting a routine tour in C-2, I visually observed inmate Glantz, Elliott in his bed and he appeared to be asleep and in no form of distress." (*Id.*) At 6:03 AM, Defendant Shade—the housing unit control officer—toured C Pod and reported "all inmates secure" before taking his post in the control booth. (*Id.* at 11 ¶ 47.) According to the Officer Log Reports, Defendant Sinner distributed meal trays to C Pod at approximately 6:32 AM. (*Id.*) Post-incident, Defendant Shade reported: "At about 6:35am I started to click C2 86 cell because inmate, Glantz Elliott, had not gotten up for breakfast trays. After going over to the cell and turning on the lights, unknown inmates had told me Glantz was dead." (*Id.* ¶ 49.) According to other post-incident reports, at approximately 6:41 AM, two inmates observed Mr. Glantz "in the seated position in the left corner with his eyes open, a swollen face, and a lack of body

movement," and the inmates alerted Defendant Shade to an incident in Mr. Glantz's cell. (*Id.* ¶ 48.) Defendants Bellissimo and Sinner "responded and observed Glantz hanging from a bedsheet affixed around his neck and attached to the top of the bed frame in his single-person cell." (*Id.* ¶ 50.) Defendant Sinner retrieved a cutdown tool from the C Pod control booth, and Defendants Sinner and Bellissimo cut Mr. Glantz down and placed him on the floor. (*Id.* ¶ 51.) Blood was coming from Mr. Glantz's nose and mouth. (*Id.*) Defendant Smith arrived, and he "began CPR, before giving way to prison medical staff and then township paramedics." (*Id.*) "According to the EMS report, when paramedics arrived, they noted dependent lividity and no CPR being performed, with guards stating they stopped CPR because '[Mr. Glantz] appeared to be down to [sic] long for CPR to help.'" (*Id.* at 12 ¶ 52.) Mr. Glantz was pronounced dead at the scene at 6:58 AM. (*Id.* ¶ 53.) "According to the coroner report authored by Forensic Pathologist Ian C. Hood, when prison staff responded, Glantz 'was already exhibiting obvious lividity and the early onset of rigor mortis.'" (*Id.* ¶ 54.) As such, Plaintiff alleges, upon information and belief, that Mr. Glantz "had already been dead for at least 1-2 hours." (*Id.*)

The Complaint goes on to allege that Mr. Glantz's suicide was not an isolated incident and was a part of a pattern and practice for the County and PrimeCare. (*Id.* ¶ 56.) The Complaint points to articles regarding inmate suicides and mental health care in Pennsylvania county jails, including MCCF, and numerous lawsuits filed against the County and PrimeCare for inmate deaths or suicides. (*See id.* at 12–18 ¶¶ 57–75.) The Complaint further alleges that the County and PrimeCare created a custom of violating civil rights and did not adhere to their written policies and procedures, including the County's Mental Health Goal And PrimeCare's Vision Statement. (*See id.* 18–19 ¶¶ 76–79.)

### B.      Procedural History

The County Defendants move to dismiss the Complaint, arguing, among other things, that Plaintiff fails to state a plausible Section 1983 claim against the individual County Defendants, Plaintiff fails to state a *Monell* claim against the County, and punitive damages are not available against the County. (ECF No. 10.) The Medical Defendants partially move to dismiss the Complaint—specifically Counts I and II—arguing, among other things, that Plaintiff fails to state a cause of action against the individual Medical Defendants and Plaintiff fails to state a *Monell* claim against PrimeCare. (ECF No. 11.) Plaintiff opposes the motions. (ECF No. 12–13.)

## II.    LEGAL STANDARD

In assessing whether Plaintiff has alleged claims upon which relief may be granted, the Court applies the familiar standard applicable to Rule 12(b)(6) motions. A plaintiff's complaint must provide merely a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). "To assess the sufficiency of a complaint under *Twombly* and *Iqbal*, a court must: 'First, . . . tak[e] note of the elements a plaintiff must plead to state a claim. Second, . . . identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are

well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'" *Palakovic v. Wetzel*, 854 F.3d 209, 220 (3d Cir. 2017) (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011)) (internal citations and quotation marks omitted).

## III.   DISCUSSION

The County Defendants move to dismiss the claims brought against the five members of MCCF's correctional staff who have been named as individual defendants—Major Sean Smith, Correctional Officer Tony Shade, Correctional Officer Riley Sinner, Correctional Officer Joseph Bellissimo, and Correctional Officer J. Subramani—arguing that the Complaint fails to allege that the individual County Defendants were deliberately indifferent to a known substantial risk of serious harm to Mr. Glantz. (ECF No. 10 at 10–13.) Further, the County Defendants move to dismiss the Section 1983 claims in Counts I and II against the County, arguing that the Complaint fails to allege sufficient facts to demonstrate that a policy, custom, or failure to train or supervise caused Mr. Glantz's death. (*Id.* at 13–18.) Additionally, the County moves to strike Plaintiff's request for punitive damages, arguing punitive damages are not available against a local government defendant. (*Id.* at 18.)

The Medical Defendants partially move to dismiss the 14th Amendment claims in Count I against the individual Medical Defendants—Marisa Friedman, Psy.D. and Emily Scordellis, Psy.D.—arguing that the Complaint fails to allege that the individual Medical Defendants were deliberately indifferent to Mr. Glantz's particular vulnerability to suicide. (ECF No. 11-1 at 11–13.) Further, the Medical Defendants move to dismiss the Section 1983 claim against PrimeCare under *Monell*, arguing that the Complaint fails to allege a policy or custom of PrimeCare exhibiting

deliberate indifference to Mr. Glantz's serious medical needs.  (*Id.* at 13–16.) The Court addresses Defendants' contentions below.

### A.      Individual Defendants

In Count I of the Complaint, Plaintiff alleges a 14th Amendment claim against all Defendants, alleging that Defendants were deliberately indifferent to Mr. Glantz's serious medical needs and his particular vulnerability to suicide. The County Defendants move to dismiss the claims brought against the five members of MCCF's correctional staff who have been named as individual defendants—Major Sean Smith, Correctional Officer Tony Shade, Correctional Officer Riley Sinner, Correctional Officer Joseph Bellissimo, and Correctional Officer J. Subramani— arguing that the Complaint fails to allege that the individual County Defendants were deliberately indifferent to a known substantial risk of serious harm to Mr. Glantz.  (ECF No. 10 at 10–13.) The Medical Defendants move to dismiss the 14th Amendment claims in Count I against the individual Medical Defendants—Marisa Friedman, Psy.D. and Emily Scordellis, Psy.D.—arguing that the Complaint fails to allege that the individual Medical Defendants were deliberately indifferent to Mr. Glantz's particular vulnerability to suicide. (ECF No. 11-1 at 11–13.) For the reasons set forth below, the Court agrees to the motion as to some individual defendants but disagrees as to others.

As a pretrial detainee, Mr. Glantz's constitutional rights while incarcerated are to be assessed by reference to the 14th Amendment's guarantee of due process. *See Palakovic*, 854 F.3d at 223 ("[W]hen a plaintiff seeks to hold a prison official liable for failing to prevent a detainee's suicide, a pre-trial detainee may bring a claim under the Due Process Clause of the Fourteenth Amendment that is essentially equivalent to the claim that a prisoner may bring under the Eighth Amendment."). Since the Third Circuit's decision in *Palakovic* held that the estate plausibly alleged both inadequate mental healthcare and vulnerability-to-suicide causes of action, *id.* at 229,

230–32, courts have recognized that causes of action for failure to provide adequate medical care and vulnerability to suicide can coexist. *See, e.g.*, *DeJesus v. Delaware through Del. Dep't of Corr.*, 833 F. App'x 936, 940 (3d Cir. 2020) ("Because these are two different claims, and the District Court did not examine one of them, namely Plaintiffs' claim of deliberate indifference to a serious medical need, we will remand."); *Horan v. Gross*, NO. 1:22-CV-1166, 2023 WL 1805843, at *9–10 (M.D. Pa. Feb. 7, 2023); *Stuart v. Pierce*, 587 F. Supp. 3d 127, 136–38 (D. Del. 2022); *Reed v. City of Phila.*, NO. 20-cv-3640, 2021 WL 2529915, at *5–7 (E.D. Pa. June 17, 2021).

Here, Plaintiff appears to allege both inadequate medical care and vulnerability-to-suicide claims. (*Compare* ECF No. 1 at 19 ¶ 82 ("At all relevant times, Defendants, acting under color of law, were deliberately indifferent to Glantz's serious medical needs in violation of the Fourteenth Amendment's ban on cruel and unusual punishment."), *with id.* ¶ 83 ("In particular, Defendants were deliberately and recklessly indifferent to Glantz's vulnerability to suicide, which they each knew or should have known about on or before September 29, 2020."). The core of Plaintiff's claim against the individual defendants is that each of them knew that Mr. Glantz needed psychiatric attention, evidenced by Mr. Glantz's extensive mental health history, reported symptoms of mood swings and racing thoughts, diagnosis with a mood disorder, and the scheduled psychiatric appointment; however, the appointment was canceled, which was a refusal or delay in providing the psychiatric care that Mr. Glantz needed. Plaintiff also claims that on the morning of Mr. Glantz's death, there was a denial of medical care. The individual defendants' arguments focus on the allegations as to each individual, and whether Plaintiff has alleged that the individual was deliberately indifferent to either Mr. Glantz's serious medical need or particular vulnerability to

suicide. While these claims are quite similar, the Court will discuss them separately below to avoid confusion and provide clarity on each issue and as to each defendant.

### 1.      Particular Vulnerability to Suicide Claim

When a plaintiff seeks to hold prison officials or medical staff accountable for failing to prevent a prison suicide, the vulnerability-to-suicide framework applies. This framework "is simply a more specific application of the general rule set forth in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) which requires that prison officials not be deliberately indifferent to the serious medical needs of prisoners." *Palakovic*, 854 F.3d at 222. "In essence, a 'particular vulnerability to suicide' is just one type of 'serious medical need.'" *Id.* (citing *Colburn v. Upper Darby Twp.* (*Colburn II*), 946 F.2d 1017, 1023 (3d Cir. 1991). To survive a motion to dismiss for claims premised on a pretrial detainee's suicide, a plaintiff must allege facts sufficient to plausibly show: "(1) that the individual had a particular vulnerability to suicide, meaning that there was a 'strong likelihood, rather than a mere possibility,' that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability." *Id.*

### a)      *Particular Vulnerability to Suicide*

To establish the first prong, Plaintiff must allege that "[t]here must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (internal citations and quotation marks omitted). However, this standard "was never intended to demand a heightened showing at the pleading stage by demonstrating . . . that the plaintiff's suicide was temporally imminent or somehow clinically inevitable. A particular individual's vulnerability to suicide must be assessed based on the totality

of the facts presented." *Palakovic*, 854 F.3d at 230. *See also Colburn II*, 946 F.2d at 1025 (finding there is a "strong likelihood" where a lay person would recognize the necessity for preventive action).

As to the first prong, the individual County Defendants do not meaningfully address whether Mr. Glantz had a particular vulnerability to suicide. The individual Medical Defendants note that "Mr. Glantz may have had risk factors for being potentially suicidal," but they go on to argue that "simply having risk factors does not equate to an inmate being on suicide precautions or virtually every inmate in a prison would be on suicide precautions for entire incarcerations." (ECF No. 11-1 at 13.) The Court is unpersuaded by the individual Medical Defendants' argument, and instead, the Court finds that Plaintiff plausibly alleges that Mr. Glantz had a particular vulnerability to suicide.

Plaintiff alleges that Mr. Glantz had an extensive mental health history, including "longstanding depression, drug and alcohol abuse, bipolarism, and multiple suicide attempts." (*See* ECF No. 12 at 1-2.) In addition, Mr. Glantz reported that he was experiencing mood swings and racing thoughts before his suicide. (*See* ECF No. 13 at 19.) Further, Dr. Friedman assessed Mr. Glantz to have an unspecified mood disorder, determined that Mr. Glantz needed to be seen by psychiatry, and scheduled a follow-up mental health appointment for three days after his appointment with psychiatry, all while Mr. Glantz was already being treated for alcohol dependency and admitted to methamphetamine use before his detention. Accordingly, the Court finds that "the sum of the facts alleged" is sufficient to support a plausible inference that there was a "strong likelihood" that self-inflicted harm would occur and that Mr. Glantz, therefore, suffered a particular vulnerability to suicide. *Palakovic*, 854 F.3d at 230.

### b)    *Knew or Should Have Known of the Particular Vulnerability*

To establish the second prong, a prison official's knowledge of an individual's vulnerability can be demonstrated when the official had "actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." *Colburn II*, 946 F.2d at 1025, n.1 (citations omitted). However, "it is not necessary that the custodian have a subjective appreciation of the detainee's 'particular vulnerability.'" *Id.* at 1024–25. In *Palakovic*, the Third Circuit found that the plaintiffs sufficiently established a reasonable inference that prison officials and medical personnel "knew or should have known" of the decedent's particular vulnerability to suicide because the decedent's records, "which the corrections officers and medical staff must have—or, at the very least, should have—reviewed when considering both his treatment and whether or not to repeatedly place him in solitary confinement," contained information about prior suicide attempts, a label as a "suicide behavior risk" with a "Stability Rating D," multiple serious mental illness diagnoses, and inclusion on the "mental health roster." *Palakovic*, 854 F.3d at 230–31.

As to the second prong, the individual County Defendants attempt to argue facts that the individual County Defendants did not have actual knowledge that Mr. Glantz had a particular vulnerability to suicide because of his unit placement, lack of medication, and there was no order for any suicide prevention measures. (*See* ECF No. 10 at 11; ECF No. 14 at 4 ("Plaintiff's complaint alleges no facts to demonstrate it to be plausible that [the individual County Defendants] had actual knowledge that Mr. Glantz had a history of suicide attempts or a diagnosis identifying suicidal propensities.").) The individual Medical Defendants do not meaningfully address whether they knew or should have known that Mr. Glantz had a particular vulnerability to suicide; instead,

the individual Medical Defendants argue that Plaintiff is second-guessing their medical judgment. (ECF No. 11-1 at 11, 13.)

The Court finds that Plaintiff has plausibly alleged that the individual defendants knew or should have known of Mr. Glantz's particular vulnerability to suicide. Plaintiff alleged that Defendant Dr. Friedman knew or should have known of Mr. Glantz's particular vulnerability to suicide due to her own assessment of Mr. Glantz, (ECF No. 1 at 9–10 ¶¶ 38–40; ECF No. 13 at 19.), and Defendant Dr. Scordellis knew or should have known because she approved and co-signed Dr. Friedman's assessment. (*Id.* at 10 ¶ 41.) Further, Plaintiff alleges that the individual Medical Defendants had actual knowledge or should have known of Mr. Glantz's particular vulnerability to suicide because PrimeCare is also the provider at BCCF, where Mr. Glantz's amassed extensive mental health records from self-disclosures, treatment, and referrals dating back to 2017, and these records were or should have been released to the PrimeCare staff at MCCF. (*Id.* at 6–8 ¶¶ 19–30.) As to the individual County Defendants, Plaintiff alleges they either had actual knowledge or should have known of Mr. Glantz's particular vulnerability to suicide because his prior PrimeCare records from BCCF were received by MCCF, Mr. Glantz's appointment with Dr. Friedman, and Mr. Glantz's had two psychiatric and/or mental health appointments scheduled. (*See id.* at 9 ¶ 38, 19–20 ¶¶ 83–84.) At the motion to dismiss stage, these allegations are sufficient; thus, Plaintiff has plausibly alleged that the individual defendants knew or should have known of Mr. Glantz's particular vulnerability to suicide.

   ***c)***   ***Reckless or Deliberate Indifference to the Particular Vulnerability***

To establish the third prong, a prison official may act with deliberate indifference to a prisoner's particular vulnerability to suicide "where: (1) a defendant took affirmative action directly leading to the suicide; (2) a defendant actually knew of the suicidal tendencies of a

particular prisoner and ignored the responsibility to take reasonable precautions; or (3) a defendant failed to take 'necessary and available precautions to protect the prisoner from self-inflicted wounds.'" *Palakovic*, 854 F.3d at 231 (quoting *Freedman v. City of Allentown*, 853 F.2d 1111, 1115 (3d Cir. 1988)). However, the Third Circuit has cautioned that "[w]hile these factual scenarios provide helpful guidance . . . each case will present unique circumstances and should be considered on its own facts." *Id.* Deliberate or reckless indifference is a willingness to ignore a foreseeable danger to the detainee's vulnerability, or conscience-shocking behavior in unhurried situations. *See Kedra v. Schroeter*, 876 F.3d 424, 446 (3d Cir. 2017) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997); *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015)). Accordingly, "[b]ecause of the nature of the [vulnerability-to-suicide] analysis," determinations as to whether a plaintiff can establish deliberate indifference or merely negligence in prison suicide cases "are very fact sensitive." *Estate of Puza v. Carbon County*, 586 F. Supp. 2d 271, 278 (M.D. Pa. 2007).

As to the third prong, the individual County Defendants analyze each individual's actions regarding Mr. Glantz separately and argue that the respective defendant's actions were not deliberately indifferent. As such, the Court also looks at each individual County Defendant and their actions or inaction. The Court finds that Plaintiff has plausibly alleged that Defendants Sinner, Subramani, and Shade failed to take necessary and available precautions to protect Mr. Glantz from self-inflicted wounds. Plaintiff alleges that each of these three Defendants had the occasion to interact with Mr. Glantz on the morning of his suicide. Specifically, Plaintiff alleges that each of these three Defendants went personally to or around Mr. Glantz's cell on the morning of September 29, 2020. (*See* ECF No. 1 at 10 ¶ 46 ("[A]t 5:53 am, C/O Subramani completed multiple tours of C-Pod sections 1, 2, 3 and found '[n]o issues to report.'"); *id.* ¶ 47 ("C/O Shade

(the C pod housing unit control officer) toured C pod at 6:03 am and found 'all inmates secure.' At 6:32 am, C/O Sinner reportedly 'hand[ed] out one meal tray to each individual in C pod.'"); *id.* ¶ 49 ("'At about 6:35am [C/O Shade] started to click C2 86 cell because inmate, Glantz Elliott, had not gotten up for breakfast trays.'").) Further, Plaintiff alleges that, before Mr. Glantz was pronounced dead at the scene at 6:58 AM, "upon information and belief, that Glantz had already been dead for at least 1-2 hours." (*Id.* at 12 ¶ 54.) Accepting Plaintiff's Complaint as true, as the Court is required to do at the motion to dismiss stage, the Court finds that Plaintiff has alleged sufficient factual matter as to these three Defendants that it is plausible on its face that they were deliberately indifferent to Mr. Glantz's particular vulnerability to suicide. *See Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 570). However, as to Defendants Major Smith and Bellissimo, their alleged involvement on the morning of Mr. Glantz's suicide is limited to Defendant Smith logging a call post-incident and Defendants Smith and Bellissimo providing aid to Mr. Glantz in efforts to save his life. (*See id.* at 10–11 ¶¶ 45, 50–51.) Accordingly, Plaintiff has not alleged sufficient factual matter as to Defendants Major Smith and Bellissimo that they were deliberately indifferent to Mr. Glantz's particular vulnerability to suicide.

The individual Medical Defendants also analyze each individual defendant's actions regarding Mr. Glantz separately and argue that the respective defendant's actions were not deliberately indifferent, emphasizing their position that "Plaintiff is doing nothing more than second guessing treatment decisions" and "Plaintiff's claim is nothing more than a difference of opinion as to the judgment of the mental health team." (ECF No. 11-1 at 11, 13.) The individual Medical Defendants are correct that courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting

*Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alterations in original). However, the Third Circuit in *Palakovic* recognized that "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Palakovic*, 854 F.3d at 228. Accordingly, prison officials commit reckless or deliberate indifference by opting "for 'an easier and less efficacious treatment' of the inmate's condition." *Id.* (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)).

Here, Plaintiff alleges that following Mr. Glantz's appointment with Defendant Dr. Friedman, where she became aware of his particular vulnerability to suicide, Mr. Glantz had a psychiatric appointment scheduled for September 28, 2020, the day before his suicide; however, no medications were ordered; inexplicably, Mr. Glantz's appointment was canceled and was not rescheduled; and, moreover, no precautions were taken or ordered for Mr. Glantz during the period between the cancellation of his appointment and when he could be seen by psychiatry. (*See* ECF No. 1 at 9–10 ¶¶ 38–40, 43.) Plaintiff admits that she does not know who canceled the psychiatry appointment, but this missing fact is not enough to undermine the plausibility of Plaintiff's claims. Thus, the Court finds that whether Defendant Dr. Friedman's decisions were opting "for 'an easier and less efficacious treatment' of the inmate's condition," and as such were reckless or deliberately indifferent, is a fact question that cannot be determined at the motion to dismiss stage. *Id.* (quoting *West*, 571 F.2d at 162). *See also Beckwith v. Blair Cty.*, No. 3:18-40, 2022 U.S. Dist. LEXIS 16407, at *22 (W.D. Pa. Jan. 28, 2022) (ruling at the summary judgment stage that a similar question was a fact question for a jury to determine). However, as to Defendant Dr. Scordellis, her only alleged involvement is that she "approved and cosigned Dr. Friedman's appointment notes from 5 days prior." (ECF No. 1 at 10 ¶ 41.) The Court finds that this factual allegation is limited in terms of Dr. Scordellis's actions and its significance and, further, this singular fact is not enough to support

a reasonable inference that Defendant Dr. Scordellis was recklessly or deliberately indifferent to Mr. Glantz's particular vulnerability to suicide.

Therefore, the Court finds that Plaintiff's factual allegations are sufficient to satisfy the plausibility standard and proceed to discovery on the vulnerability-to-suicide claim as to Defendants Sinner, Subramani, Shade, and Dr. Friedman. However, Plaintiff has failed to sufficiently allege a vulnerability-to-suicide claim against Defendants Major Smith, Bellissimo, and Dr. Scordellis.

### 2.    Deliberate Indifference to Serious Medical Need Claim

To survive the motion to dismiss for claims of inadequate medical care, Plaintiff must allege sufficient factual matter demonstrating that: (1) Mr. Glantz had a serious medical need, and (2) acts or omissions by prison officials indicating they were deliberately indifferent to that need— i.e., the prison officials subjectively knew of the deprivation and "disregard[ed] an excessive risk to [the] inmate['s] health or safety." *Natale v. Camden County Correc. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). And the prison officials being sued "must have had personal involvement in the alleged violation." *Simmons v. Pierce*, 803 F. App'x 669, 670 (3d Cir. 2020). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Est. of Morcho by & Through Carson v. Borough*, No. CV 22-3245, 2024 WL 21940, at *7 (E.D. Pa. Jan. 2, 2024) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

A deliberate indifference to serious medical need analysis is nearly identical to a deliberate indifference to a particular vulnerability to suicide analysis. Therefore, for substantially the same reasons why the vulnerability-to-suicide claim will survive as to Defendants Sinner, Subramani, Shade, and Dr. Friedman, the inadequate medical care claim will survive as well. Plaintiff sufficiently alleged that Mr. Glantz had a particular vulnerability to suicide and therefore, had a serious medical need. In addition, Plaintiff alleges that, at some point on the morning of September 29, 2020, Mr. Glantz was in acute distress and in need of immediate medical attention. Accordingly, at this stage, Plaintiff has sufficiently pled that these four individual Defendants displayed deliberate indifference to Mr. Glantz's serious medical need. Therefore, the inadequate medical care claim that certain individual Defendants were recklessly or deliberately indifferent to a serious medical need will survive.

In summary, the Court grants in part and denies in part Defendants' motions to dismiss Count I against the individual Defendants. The Court denies Defendants' motions to dismiss Count I against Defendants Sinner, Subramani, Shade, and Dr. Friedman. As to Defendants Major Smith, Bellissimo, and Dr. Scordellis, the Court grants Defendants' motions to dismiss these three individual Defendants without prejudice. However, if discovery reveals information that these three individual Defendants may be liable to Plaintiff, then Plaintiff may seek leave from the Court to file an amended complaint to re-assert claims against these three individual Defendants.

### B.    Section 1983 Claims under *Monell*

In Counts I and II of Plaintiff's Complaint, Plaintiff asserts claims under Section 1983 against the County and PrimeCare for the alleged violation of Mr. Glantz's 14th Amendment rights. (ECF No. 1 at 19, 22.) The County Defendants move to dismiss the Section 1983 claims against the County, arguing that the Complaint fails to allege sufficient facts to demonstrate that a

policy, custom, or failure to train or supervise caused Mr. Glantz's death. (ECF No. 10 at 13–18.) Further, the Medical Defendants move to dismiss the Section 1983 claims against PrimeCare, arguing that the Complaint fails to allege a policy or custom of PrimeCare exhibiting deliberate indifference to Mr. Glantz's serious medical needs.  (ECF No. 11-1 at 13–16.)

In *Monell v. Department of Social Services*, the Supreme Court held that a municipality is only liable when the plaintiff can show that the municipality itself, by implementing a municipal policy, regulation, or decision either formally adopted or informally adopted through custom, actually caused the alleged constitutional transgression, not via *respondeat superior*. *See* 436 U.S. 658, 690–92 (1978); *see also id.* at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). A private medical contractor fulfilling a municipal function is liable for Section 1983 damages when a policy, practice, or custom of the entity causes a constitutional violation. *See Palakovic*, 854 F.3d at 232 (citing *Natale*, 318 F.3d at 583–84).

## 1.   Policy or Custom

To appropriately plead a *Monell* claim, Plaintiff must identify a policy or custom and then "plead facts demonstrating a 'direct causal link between [the] policy or custom and the alleged constitutional deprivation.'" *Ekwunife v. City of Phila.*, 245 F.Supp.3d 660, 675 (E.D. Pa. 2017) (quoting *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 249 (3d Cir. 2007)). "A policy is made when a decisionmaker possessing the final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict[, and a] custom is an act that has not been formally approved by an appropriate decisionmaker, but that is so widespread as to have the force of law." *Natale*, 318 F.3d at 584 (internal quotes and citations omitted).

The first requirement of the *Monell* test is for Plaintiff to establish that "the municipality had a policy or custom that deprived the plaintiff of his constitutional rights." *Ekwunife*, 245 F.Supp.3d at 674 (citing *Monell*, 436 U.S. at 692–94). There are numerous ways a plaintiff can sufficiently allege the existence of a municipal policy or custom to establish a *Monell* claim: (1) a plaintiff can cite the official policy, *Monell*, 436 U.S. at 690; (2) a plaintiff can make specific reference to "multiple incidents" implicating a particular custom, *see Harris v. City of Philadelphia*, 171 F. Supp. 3d 395, 401–02 (E.D. Pa. 2016); or (3) a plaintiff can even establish custom by conducting a statistical analysis of lawsuits against a municipality for a violation of a particular constitutional right, *see Simpson v. Ferry*, 202 F. Supp. 3d 444, 452–53 (E.D. Pa. 2016).

Here, the Court agrees with the County that Plaintiff fails to "identify or state the contents of any formal policy that allegedly caused a delay, interference with, or negligent provision of mental health care to Mr. Glantz." (ECF No. 10 at 14.) The Court also agrees with the County that Plaintiff "does not allege facts to demonstrate any identified 'custom' – that is, any wide-spread practice so permanent and well-settled as to virtually constitute law." (*Id.* at 15.) PrimeCare does not meaningfully address the policy or custom prong, focusing, instead, that Plaintiff failed to allege deliberate indifference; however, the Court finds that the deficiency highlighted by the County is applicable to both the County and PrimeCare.

Plaintiff alleges the following general statement: "Despite numerous and repeated inmate suicides and suicide attempts over the years, the County and PrimeCare failed to create, implement and/or enforce the necessary policies and customs to protect civil rights of MCCF prisoners, thereby establishing a custom of violating civil rights of those within their custody and control." (ECF No. 1 at 18 ¶ 76.) However, courts regularly do not accept such blanket allegations as sufficiently alleging a policy or custom that violated a plaintiff's rights, and typically, courts

require a more specific allegation to be sufficient. *See, e.g.*, *Myers v. Clinton Cty. Corr. Facility*, No. 3:21-CV-00867, 2022 U.S. Dist. LEXIS 91005, at *15 (M.D. Pa. May 20, 2022) ("[The plaintiff] alleges that Clinton County maintains an unconstitutional policy, custom, or practice 'to admit inmates into the Correctional Facility and provide them with a dangerous disposable razor without a mental health screening.'"); *Arcuri v. Cnty. of Montgomery*, No. CV 20-5408, 2021 WL 1811576, at *8 (E.D. Pa. May 6, 2021) (finding the plaintiffs "merely use the framework of a *Monell* claim and do not proffer facts to suggest that Montgomery County created or implemented the alleged policies or customs" and finding that "the allegations in the Complaint concern only the purported experiences of Decedent with the County"); *Wright v. Westmoreland Cty.*, Civil Action No. 05-503, 2006 U.S. Dist. LEXIS 105573, at *12 (W.D. Pa. Feb. 2, 2006) ("[T]he policy set by defendant County, Cornell and/or NaphCare regarding the screening for suicide risk at WCP did not include a provision such that a prior suicide threat at the facility raised a red flag regarding an inmate's suicide risk. It is also believed and therefore alleged that the suicide risk screening policy of the County, Cornell, and/or NaphCare failed to include inquiry into other highly relevant factors in determining the level of risk for an inmate at WCP.").

Plaintiff further goes on to allege a variety of existing policies that the County and PrimeCare failed to adhere to, including its Mental Health Goal, the 2014 Standards for Health Services in Jails, and the 2015 Standards for Mental Health Services for Correctional Facilities. However, beyond a conclusory allegation that the County and PrimeCare regularly disregard these existing policies to the extent that disregarding the policies has become a custom of the County and PrimeCare, Plaintiff has not pled sufficient factual matter to support this assertion.

Specifically, Plaintiff cites "multiple incidents" of suicide and attempted suicide going back several years involving the County and/or PrimeCare, and Plaintiff refers to articles written

about the statistics behind suicides and attempted suicides at MCCF or facilities serviced by PrimeCare. First, the timing and frequency of the "multiple incidents" give the Court some pause as to whether the allegations are sufficient compared to the caselaw. For example, in *Colburn I*, the plaintiff alleged that the decedent in that case was the third person to commit suicide at the Upper Darby Township police department jail in the past twenty-nine months, *Colburn v. Upper Darby Township* (*Colburn I*), 838 F.2d 663 (3d Cir. 1988), and the Third Circuit stated that "[t]he two prior suicides can be viewed as providing the governing body of Upper Darby with actual or constructive knowledge of the alleged custom of inadequate monitoring of jail cells." *Id.* at 672 (citing *Partridge v. Two Unknown Police Officers*, 791 F.2d 1182, 1189 (5th Cir. 1986)). *See also Wright v. Westmoreland Cty.*, Civil Action No. 05-503, 2006 U.S. Dist. LEXIS 105573, at *16 (W.D. Pa. Feb. 2, 2006) ("Plaintiff here also includes an allegation that there had been three prior suicides at [Westmoreland County Prison] in the twenty-five months preceding Steadman's suicide. . . As in *Colburn I*, Defendants' knowledge of these three prior suicides can be viewed by the officials at WCP with actual or constructive knowledge of the alleged custom of inadequate suicide risk screening procedures."). In the present case, Plaintiff's allegations referring to "multiple incidents" and statistical articles do not similarly demonstrate a specific pattern that could provide the County and PrimeCare with actual or constructive knowledge of an alleged custom or policy failure. Second, and more importantly, Plaintiff does not use the "multiple incidents" or statistics to implicate a particular policy or custom, which is necessary to establish a link between the incidents and any alleged deficiencies in policy or practice. Accordingly, the Court finds that Plaintiff has not sufficiently alleged a policy or custom of the County or PrimeCare that caused the alleged constitutional transgressions.

The next requirement of the *Monell* test is that the "plaintiff's injuries were caused by the identified policy or custom." *Ekwunife*, 245 F.Supp.3d at 674 (citing *Monell*, 436 U.S. at 692–94). "A showing of causation, based on a custom, requires a plaintiff to show 'that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury.'" *Yoast v. Pottstown Borough*, 437 F. Supp. 3d 403, 439 (E.D. Pa. 2020), aff'd, No. 22-1960, 2023 WL 4418213 (3d Cir. July 10, 2023) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

One of the policies highlighted by Plaintiff is Section MH-E-09, CONTINUITY AND COORDINATION OF MENTAL HEALTH CARE DURING INCARCERATION, in the 2015 Standards: "When delays or long wait times for specialty appointments occur, mental health staff should take intermediate care measures (e.g., placement in an observation cell) to monitor the inmate's mental status while waiting for these appointments." (ECF No. 1 at 21 ¶ 88.) However, even if the Court interprets Plaintiff's Complaint to sufficiently allege that the County or PrimeCare has a custom of failing to implement and/or enforce this policy, Plaintiff cannot satisfy the causation element. Plaintiff has not alleged that any policymakers were aware of similar conduct, as none of the suicides or attempted suicides—and resulting litigation or news articles—highlighted by Plaintiff involved violating this identified policy.

## 2.   Failure to Train or Supervise[2]

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official

---

[2] Plaintiff alleged *Monell* liability premised on either a policy or custom or failure to train or supervise as to both the County and PrimeCare. (*See* ECF No. 1 at 22 ¶ 93.) PrimeCare did not raise failure to train or supervise in its motion to dismiss. (*See* ECF No. 11.) The Court notes that in her response brief, Plaintiff (seemingly believing that PrimeCare had raised failure to train or supervise) stated that "[PrimeCare's] motion to dismiss must be denied in accordance with

government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A municipality can be liable under *Monell* for failure to train its employees, "if the failure to train 'amount[s] to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Ekwunife*, 245 F.Supp.3d at 674 (quoting *Connick*, 563 U.S. at 61)) (alterations in original) (internal quotation marks omitted). Failure to train "employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." *Kline ex rel. Arndt v. Mansfield*, 255 F. App'x 624, 629 (3d Cir. 2007) (quoting *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000)). Although "rare," a single incident may establish deliberate indifference if the "consequences of failing to train could be so patently obvious." *Ekwunife*, 245 F.Supp.3d at 675 (citing *Connick*, 562 U.S. at 63). "In a prison suicide case, this means that the plaintiff must (1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." *Colburn II*, 946 F.2d at 1029–30. The second factor can be established by demonstrating that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee

---

binding legal precedent, insofar as the Complaint sufficiently pled a pattern of inadequate policies and training that caused a deliberate indifference to serious medical needs, including a vulnerability to suicide." (ECF No. 13 at 29.) Further, the Court notes that PrimeCare did not file a reply brief in support of its motion. Thus, the Court does not dismiss the Section 1983 claim against PrimeCare, given that PrimeCare did not address the failure to train or supervise arguments.

will frequently cause deprivation of constitutional rights." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).

Here, the Court agrees with the County that Plaintiff's Complaint "makes broad-brush, conclusory allegations that the County was deliberately indifferent 'to the need for hiring, training, supervision, investigation, monitoring, and/or discipline with respect to the provision of specialized medical care to inmates such as Glantz.'" (ECF No. 10 at 16 (quoting ECF No. 1 at 22 ¶ 93.) Accordingly, Plaintiff does not identify specific training that could have prevented the suicide. Further, Plaintiff does not allege any facts beyond conclusory allegations to support an inference of deliberate indifference; specifically, Plaintiff does not allege facts to support any of the *Carter* factors.

The Court recognizes Plaintiff's argument that she does not currently possess specific policy-related information, and this should not render her Complaint insufficient because "Plaintiff will seek discovery on any MCCF policies governing the decision to cancel a Psychiatry appointment for a detainee with mental health issues and a vulnerability to suicide." (ECF No. 12 at 24 n.12.) However, the Court must determine whether the complaint contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Currently, Plaintiff has not pled enough facts to demonstrate facial plausibility that the County caused a constitutional violation to Plaintiff. Accordingly, the Court grants the County Defendants' motion to dismiss Counts I and II against the County without prejudice.

## C. Punitive Damages against the County

The County moves to strike Plaintiff's request for punitive damages, arguing punitive damages are not available against a local government defendant. (ECF No. 10 at 18.) It is well

settled that a plaintiff may not seek punitive damages against a municipality. *See Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[W]e hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983."); *City of Phila. Office of Hous. & Cmty. Dev. v. Am. Fed'n of State Cty & Mun. Emps, Local Union No. 1971*, 876 A.2d 375, 378 (Pa. 2005) ("[G]overnment agencies have long been exempt from the imposition of punitive damages.").[3] Accordingly, the County's motion to strike is granted.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss. The Court grants Defendants' motions to the extent that it dismisses Count I against Defendants Major Smith, Bellissimo, and Dr. Scordellis without prejudice. The Court denies Defendants' motions to dismiss Count I against Defendants Sinner, Subramani, Shade, and Dr. Friedman. The Court grants the County Defendants' motion to dismiss Counts I and II against the County without prejudice. The Court grants the County Defendants' motion to strike Plaintiff's request for punitive damages against the County. The Court denies the Medical Defendants' partial motion to dismiss Counts I and II against PrimeCare.[4]

An appropriate order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**

---

[3] Plaintiff does not appear to dispute this as she does not address the issue of punitive damages in her response to the County's motion to dismiss. (*See generally* ECF No. 12.)

[4] As discussed above, *see supra* n.2, because PrimeCare failed to address Plaintiff's allegations regarding the failure to train or supervise, Plaintiff's *Monell* claims against PrimeCare survive the motion to dismiss stage.